# SUN OIL CO. v. RAILROAD COMMISSION et al.

## No. 8052.

Court of Civil Appeals of Texas. Austin.
Dec. 22, 1933.

Rehearing Denied Feb. 7, 1934.

and 3,342 feet long, containing 2.59 acres, and to set aside the order of the Railroad Commission granting permits for said wells. Pending a determination of this appeal, this court entered on September 29, 1933, a temporary restraining order, restraining appellees from drilling wells Nos. 1 and 3 authorized by the Railroad Commission. This order did not, however, relate to well No. 2, near the center of the tract.

The case arose under the following pertinent facts: One Rich Lee and wife were former owners of a 240-acre tract in Rusk county, which included the strip in question and the lands to the north and south thereof, all held as one body of land. After their deaths, six of their children partitioned said lands in March, 1921. There was set aside to Malinda Schuler a 42-acre tract south of and adjoining in its entire length the 2.59-acre tract here involved. To Mary V. Flanagan there was set apart this 2.59-acre tract and a 39⅓-acre track immediately south of and adjoining in its entire length Malinda Schuler's 42-acre tract. Thereafter, in August 1921, Mary V. Flanagan conveyed to Malinda Schuler this 2.59-acre tract in exchange for a 2⅔-acre tract conveyed to her at the same time by Malinda Schuler out of the west end of the latter's 42-acre tract. This exchange gave to Malinda Schuler her 42 acres, including the strip here in controversy, all adjacent and constituting one contiguous body of land, and to Mary V. Flanagan her 42 acres of contiguous lands instead of having same separated by the Malinda Schuler tract as created in the original partition.

A seventh child of Rich and Mary Lee, who was then thought to be dead, and who was not considered in the partition of 1921, appeared in 1931 and claimed his one-seventh interest in all of said lands, and his interest in the Malinda Schuler tract, including the 2.59-acre tract, was acquired by appellant Sun Oil Company, leaving only a six-sevenths interest claimed by appellees. To avoid confusion and for the purposes of the issues here presented, we shall discuss the issues as if Malinda Schuler owned the entire estate in said lands at the time she and her son executed a lease thereon to the Sun Oil Company on July 21, 1930. It may also be noted that a suit is now pending on appeal in the Court of Civil Appeals at Texarkana wherein appellant contends, and which contention was decided against it by the trial court in that case, that its lease from Malinda Schuler and son in fact covers

T. L. Foster and J. W. Timmins, both of Dallas, and Ben H. Powell, Phillip Tocker, and J. A. Rauhut, all of Austin, for appellant Sun Oil Co.

Jas. V. Allred, Atty. Gen., and Maurice Cheek, Asst. Atty. Gen., for appellee Railroad Commission.

Ramey, Calhoun & Marsh, of Tyler, for appellees H. D. Bennett, Katherine Ryan, and Frank King.

BAUGH, Justice.

This appeal is from an order of the district court of Travis county denying appellant's application for a temporary injunction to restrain the appellees Bennett, Ryan, and Scheultz from drilling three wells on a strip of land in Rusk county, Tex., 33 feet wide

the strip here in controversy. But by written agreement, and to avoid a receivership, it was agreed, among other things, that, pending the outcome of the suit, appellees, subject to appellant's right to protest their application therefor, might drill such wells on said strip of land as the Railroad Commission would grant them permits for. The permits herein attacked were granted to appellees by the Railroad Commission on July 12, 1933, without notice to appellant, and without a hearing, and recited that same were granted to protect vested rights under exceptions to rule 37 of the Railroad Commission.

Several contentions are presented on this appeal, but, since we have concluded that one of them disposes of the entire controversy, we shall pretermit a discussion of the others. We are met at the threshold of the case with the question of whether the owners of the fee to the 42 acres, of which the 2.59-acre strip is a part, and which entire 42-acre tract was capable of development as a unit, under regulations of the Railroad Commission, in such manner as to extract therefrom all of the oil to which such owners were entitled, can by their voluntary act subdivide in small tracts said 42 acres so as to require exceptions to rule 37 and permit the drilling of more wells thereon than would otherwise be permitted under the conservation laws of the state and the rules of the Railroad Commission promulgated pursuant thereto; that is, can the owners of a tract of land capable of development as a whole, under the conservation laws of the state and valid rules of the Railroad Commission, voluntarily divide same into small tracts and thereby create in themselves or in their assignees "vested rights" in such small tracts which would entitle them to more wells thereon than they could have drilled thereon under the law but for such subdivision into small tracts. We have reached the conclusion that they cannot.

Rule 37 was promulgated by the Railroad Commission in 1919, and was in force at the time the Schulers, under whom appellees claim, acquired title to the land here involved in 1921. Its validity has been upheld by the courts and is not here questioned. Bass v. R. R. Com. (Tex. Civ. App.) 10 S.W.(2d) 589; Danciger Oil & Ref. Co. v. R. R. Com. (Tex. Civ. App.) 49 S.W.(2d) 837, and cases there cited. When first promulgated rule 37 provided for spacing of wells 300 feet apart and 150 feet from the property lines, and for exceptions to protect vested rights. It is now settled that orders of the Railroad Commission, validly issued in accordance with law, and when operating prospectively, are legislative in character and have "the force and effect of an enactment of the Legislature." West Tex. Compress & Warehouse Co. v. Ry. Co. (Tex. Com. App.) 15 S.W.(2d) 558, 560; Missouri-Kansas & T. Ry. Co. v. R. R. Com. (Tex. Civ. App.) 3 S.W.(2d) 489; Railroad Com. v. Uvalde Const. Co. (Tex. Civ. App.) 49 S.W.(2d) 1113; Coleman Gas & Oil Co. v. Santa Anna Gas Co. (Tex. Civ. App.) 58 S.W.(2d) 540. As such, therefore, all parties leasing land for oil and gas subsequent to its promulgation are required to take cognizance of said rule 37. Being a valid order, sustained under the police power of the state, all parties affected by it must contract with reference to this well-recognized rule, and not in violation of it; and contracts, whether by conveyance or lease, covering the subject-matter to which it relates, must be entered into and construed in keeping with its terms. It is not necessary, so far as this controversy is concerned, for us to undertake to define the term "vested rights," nor to attempt to prescribe its limitations. Whatever the conditions under which vested rights may arise, certainly they must arise in conformity with law, and cannot grow out of a violation or an evasion of it. Any asserted right, therefore, the validity of which must be predicated upon a clear contravention of the terms and provisions of rule 37, cannot become a vested right.

To hold otherwise would be to set at naught the conservation laws of the state. There can be no distinction in principle between the right of the state through its Railroad Commission to limit the number of wells to be drilled in a given oil field on a given surface area, spaced at minimum distance from each other and its power to limit and prorate the amount of production from wells legally drilled. And the owners have no more right to contract, whether by lease, drilling contract, conveyance, partition, or otherwise, in such manner as to circumvent the purposes of this order of the commission, and thus acquire a right which, if permitted and enforced, would defeat those purposes, than they have to contract for the production from a given well of more oil than their allowable under a proration order of the commission, and by such contract acquire a vested right to do so. If the owner of a tract of land which is capable of development as a whole in such manner as to extract therefrom all the oil he is entitled to under the conservation laws of the state, be permitted, under the guise of vested rights, either to lease same in small tracts, or to lease a portion thereof

and reserve unto himself a small strip (and there is no difference in principle) and thus secure one or more wells on each small tract, it is obvious that the conservation laws would be rendered nugatory.

The case here presented clearly illustrates what such a course would lead to. The area here involved is in a proven field where the sands are very porous and the oil very mobile. It is not controverted that a single well in that field will effectively drain ten acres surrounding it. Nor is it controverted that excessive drainage in a concentrated area will result in waste which is prohibited by the Conservation Act. After a full hearing the Railroad Commission determined, and amended its rule 37 accordingly, that wells should be spaced 660 feet apart in that field in order to prevent waste; i. e., one well to approximately 10 acres of land. According to their own rule, therefore, promulgated after an extensive hearing, wells in closer proximity producing equally would tend to create waste. If the three wells on this 2.59-acre strip, for which the commission granted permits, be drilled, a situation would be created, which the very rule itself seeks to prevent, calculated to cause waste, a condition which the statute imposes upon them the mandatory duty to prevent. The commission is the duly constituted agency of the state to ascertain what constitutes waste of oil and gas. This it must do after hearings and a careful investigation with reference thereto. And when it has promulgated a general rule, a power expressly delegated to it, after a full and careful consideration of the subject to which such rule relates, as amended rule 37 was, it cannot thereafter even itself arbitrarily grant exceptions thereto which would in effect indubitably destroy the efficacy of the rule itself.

In no event could the Schulers, even under authority of the commission to grant exceptions where legally authorized, as owners of the entire 42-acre tract, legally create a condition by their own voluntary acts which would vest in them or in their assigns any right to such exception, and thus be enabled to do indirectly that which they were forbidden by law to do directly; i. e., procure more wells on their lands than they were otherwise legally entitled to. Without undertaking to pass upon what facts or circumstances will authorize an exception to rule 37, we do expressly hold that no owner of lands which can be developed as a whole under the conservation laws of the state and the valid rules of the Railroad Commission in force at the time he undertakes to do so can by his voluntary

acts divide same into small tracts by severance of the minerals, lease, or otherwise, and thus create in himself, or in any assignee or vendee under him, any vested right to any exception to the conservation rules of the commission which would enable him to circumvent the conservation laws and valid rules of the commission designed to make such laws effective. Such owner, whether of the leasehold, the minerals, or the fee, must contract in consonance with such laws and rules and subject to their provisions. Otherwise he is entitled to no exceptions to, nor relief from, the burdens they impose.

Rights in the individual to the use of his property are subordinate to rights of the state under its police power to regulate, curtail, or even prevent entirely such use if the public welfare requires it. He can by his voluntary acts obtain no vested right in himself which would defeat or impair the state's proper exercise of that power.

This conclusion renders unnecessary the discussion of the other issues raised. We think the Railroad Commission erroneously granted the permits attacked and that they had no authority to do so under the uncontroverted facts of this case. In passing, and without discussing that issue, we think it is clear, under the statute (article 6036a, Vernon's Ann. Civ. St., Acts 1929, 41st Leg., p. 694, c. 313, § 5), that appellant was entitled to notice and an opportunity to be heard on appellees' application for such permits, which was not accorded it. Magnolia Pet. Co. v. Edgar (Tex. Civ. App.) 62 S.W.(2d) 359; Rabbit Creek Oil Co. v. Shell Pet. Corporation, 66 S.W.(2d) 737, decided by this court on November 15, 1933.

For the reasons stated, the judgment of the trial court is reversed, and judgment here rendered granting to appellant the injunction prayed for against the appellees pending a trial of this case on its merits, upon appellant executing a proper bond in such sum as may be agreed to by the parties, or in case of failure to so agree to be fixed by the court, and conditioned as provided by law.

Reversed and rendered, with instructions.

## On Motion for Rehearing.

Appellees, other than the Railroad Commission, urgently insist in their motion for a rehearing that the action of the Railroad Commission, in granting the permits involved, is clearly sustainable under the commission's amendment of June 13, 1933, authorizing the granting of exceptions to rule 37 (that is, as to spacing at minimum distances from other

wells or from property lines), "to protect any property against undue drainage by reason of the operation of the wells of any other operator. * * *" This amendment to the rule was added to former exceptions embodied in the rule itself which the commission would grant where necessary "to prevent waste, or to protect vested rights. * * *" They also urge that, even though the recitals in the permits were that same were granted to protect vested rights, the uncontroverted evidence showed undue drainage of said 2.59 acres by wells of other operators, and that the latter ground would sustain the permits. We agree with appellees that, if the permits can be sustained upon other legal grounds than those improperly recited in the order of the commission, the courts should not strike them down, and so held in Lon A. Smith et al. v. Maurice Stewart, 68 S.W.(2d) 627, decided by this court on January 2, 1934.

It is also urged that, power being delegated to the commission to promulgate rule 37, the same power authorizes them to abrogate, repeal, or amend it as circumstances may require. and that therefore the exceptions to the rule granted by the commission carry the same degree of efficacy, and have the same binding force as the rule itself. If the exceptions are authorized upon legal and valid grounds, such contention is undoubtedly correct. But, unless they are, such contention is not.

■ In every enunciation of rule 37, and all amendments thereto, a minimum spacing of wells from each other and/or from property lines has been required except in the salt dome fields. Its basis is essentially that of conservation of the natural resources. If proper spacing of wells for that purpose is not necessary, the rule is without foundation to sustain it. To this spacing limitation upon the drilling of wells, and for purposes of conservation, has been added, among other things, proration of, or limitation upon, production. But never has the commission abandoned its spacing requirement as necessary to prevent waste, except, as stated, in the Gulf Coast fields. We take it, therefore, that the commission deemed proper spacing of wells as absolutely essential in order to prevent waste. It is true that different spacing requirements, save as to salt dome fields, have been found necessary, and have been prescribed by the commission for different oil fields as underground formations, depth, and water and gas pressure may require. But the spacing requirement has been uniformly incorporated in rule 37 since its promulgation so far as the East Texas field is concerned. Exceptions, therefore, must have their basis either as necessary to prevent waste (the same purpose sustaining the spacing requirement itself) or to protect some vested right of the owner. While the matters of offsets and of undue drainage have been added as exceptions, they are in final analysis, so far as the owners are concerned, but phases of vested rights. And if the owner of the land, by his voluntary act, creates a condition or seeks thereby to invest himself with a right which he would not have otherwise been entitled to under the general provisions of rule 37, such act is but to circumvent the rule and to render it incapable of enforcement.

■ Protection against undue drainage is but a protection of a right legally vested; and, if the owner creates, by his attempt to circumvent the spacing requirements of rule 37, and by his voluntary act in the face of rule 37 a condition causing undue drainage of his particular small tract, which he has voluntarily set apart or has acquired for the purpose of production, the efficacy of said rule 37 would be destroyed as effectually in one manner as in another. If by such action he can secure the right to drill a small tract, which he has voluntarily segregated from his larger tract, on the ground of adjoining drainage, he has worked a nullification of said rule 37 as effectively as if he had obtained a permit under any other exception to the rule. Undue drainage, therefore, resulting from his own voluntary act in creating a condition which produces it, does not vest in him, or in his assigns, any right to an exception, in order that he may be relieved of a situation that is the result of his own choosing. Otherwise by alienating his land in small tracts in a proven field, when any one of such tracts should be drilled, to protect against undue drainage, the surrounding tracts would be entitled to an exception, if appellees' contention is correct, until eventually all such tracts must be drilled and rule 37 as to spacing entirely set at naught. This condition he cannot voluntarily create in the face of rule 37, and thus under the guise of a vested right nullify its provisions and purposes.

The very term "exception" necessarily implies a departure from a rule otherwise found necessary to prevent or minimize waste. It must be in derogation of the general rule as to proper spacing; otherwise it is not an exception. We do not dissent from the proposition that an owner of land, acquired without reference to rule 37, and of the oil beneath it, cannot by such rule be deprived of his prop-

erty or denied the proper use or development of it. But that is not the issue here presented. What we mean to hold, and all we mean to hold, is that, as the owner of a tract of land capable of development as a whole in consonance with the conservation laws of the state and the rules of the commission found necessary by it to prevent waste, he cannot so divide it into small tracts as to create in himself a right to require the commission to depart from its general rule as to spacing wells in that particular field, and thereby be enabled to secure for himself or to those to whom he conveys, a greater number of wells on his lands than he would otherwise be entitled to. This is not a denial to him of protection of a vested right legally existing; but only that no such right vests, or can vest in him or in his assignees, under the facts and circumstances here presented, which brings his claim for a permit within the purview of rule 37 or the exceptions therein authorized.

Appellees' motion is therefore overruled.

Overruled.

BLAIR, Justice (dissenting).

In the instant case the writer agreed with the holding that the commission erroneously granted the permits to drill the wells on the 2.59-acre tract in question, because appellant as adjacent lessee was entitled to notice of the application for the permits, which was not accorded it. The permits were also erroneously granted, because the title to the oil and gas estate in the tract was in litigation between appellant and appellee in another suit now pending on appeal. True, they agreed that the oil and gas estate in the tract might be regarded for the purpose of this suit as the property of appellees, but conditioned that such agreement would not affect the rights of either party in the other pending suit. Manifestly this court has no jurisdiction to determine whether appellees have the right to drill the wells under the permits granted until they have acquired the title to the oil and gas estate in the tract sought to be drilled. The proper judgment would have been to have enjoined the drilling of the wells under the permits granted, and to have dismissed the suit without prejudice to the right of appellees, if they should recover title to the oil and gas estate in the tract in the other pending suit, to again apply for permits to drill such wells as the commission may grant under the conservation laws and its rules and regulations, after notice and hearing of the application for the permits.

But notwithstanding either of the foregoing conclusions would have disposed of the instant case, the majority opinion construed and interpreted rule 37 as promulgated in 1919, and under the interpretation given the rule held that from and after its promulgation the rule "had the force and effect of an enactment of the Legislature"; that "all parties leasing land subsequent to its promulgation are required to take cognizance of said Rule 37"; that they "must contract with reference to this well settled rule"; and that "contracts, whether by conveyance or lease, covering the subject-matter to which it relates, must be entered into and construed in keeping with its" general spacing distances for oil wells. And notwithstanding rule 37 as adopted in 1919, and each amendment thereto, has provided for an exception to the general spacing distances prescribed "to protect vested rights," the majority view holds that "any asserted right" in contravention of the general spacing distances prescribed "cannot become a vested right."

By memoranda opinions this interpretation of rule 37 as promulgated in 1919 was made to apply to the cases of Humble Oil & Refining Co. v. Railroad Commission et al. (No. 7996) 68 S.W.(2d) 625, and Lon A. Smith et al. v. Maurice Stewart (No. 8069) 68 S.W.(2d) 627, which were submitted and regarded as companion cases to the instant case, the majority view holding in effect that, since the parties acquired the respective small tracts of land involved in these suits subsequent to the promulgation of rule 37 in 1919, they would never be entitled to drill any well or wells on either of the tracts of land.

The writer is not in accord with the interpretation given rule 37 as promulgated in 1919, if it has any application to these cases, nor with the interpretation given the special amended rule 37 made applicable only to the East Texas field, in which the lands involved are situated.

To avoid repetition, the points of dissent will be stated where they are discussed in the opinion.

A review of the history of rule 37 as adopted in 1919, its amendments, and the construction and interpretation given it by the commission is necessary to a proper interpretation of the rule. Before its promulgation in 1919, there was no limitation upon the right of an owner of a tract of land, regardless of its size or shape, to drill as many wells on it as he desired, and at any point with reference to his property line as he

might choose. When first adopted, and continuously since, rule 37 has provided for the spacing of wells 300 feet apart and 150 feet from property lines, but with exceptions made a part of the rule since its inception. The first exceptions read as follows: "Provided that the Commission upon petition filed showing good cause, and proved that no injustice will be done, may, after hearing had, upon notice to adjoining owners or lessees, allow drilling within shorter distances than above prescribed. Rule 37 shall not for the present be enforced within the developed and defined oil fields known as the Gulf Coast Fields." See Book 17, Minutes of the Railroad Commission, pp. 203–205.

The foregoing exceptions and exemptions were amended in March, 1923, to read as follows: "Provided, that the Commission, in order to prevent waste or to protect vested rights, will grant exceptions permitting drilling within shorter distances than as above prescribed. Rule 37 shall not for the present be enforced within proven salt dome fields."

In each oil and gas circular promulgated by the commission since the above amendment in March, 1923, rule 37 has been designated as a "general rule," although it has always exempted proven salt dome fields and has always been construed by the commission as having no application to unproven or wildcat fields. It has always provided for the same general spacing distance between wells and property lines, and with the same exceptions and exemptions last above quoted; and each succeeding circular published as the general and special rules and regulations for the conservation of oil and gas has by express provision abrogated the next-preceding circular. See Oil and Gas Circulars Nos. 14, 15, and the very complete circular promulgated and published on October 17, 1933, which has apparently revised, amended, and codified all general and special rules and regulations of the commission for the conservation of oil and gas.

The records and minutes of the commission and the evidence adduced on the hearings before the commission and the court in cause No. 7996 show that the commission has always construed and interpreted the exception to "protect vested rights" as authorizing the drilling of wells closer than the general spacing rule prescribed on small tracts of land under separate ownership without regard to when the title thereto was acquired. Wells have also been allowed under this exception in cases of partition after the adop-

tion of the rule. The evidence is also undisputed in cause No. 7996 that many wells have been authorized under each of the exceptions to general rule 37, without regard to when the title to the land, or the oil and gas interest therein, was acquired.

Article 6046, Vernon's Ann. Civ. St., authorized the commission to "make and enforce rules and regulations either general in their nature or applicable to particular oil fields"; and pursuant to this authority the commission has in recent years from time to time adopted special rules and regulations which now control a large number of oil fields, including the East Texas field, in which the three tracts of land involved in the cases under consideration are situated. See Oil and Gas Circulars Nos. 14, 15, and the circular published on October 17, 1933. In each instance, where special rules and regulations have been promulgated by the commission for a particular field, the commission has expressly ordered and provided that such special rules and regulations shall abrogate or supersede all general rules and regulations promulgated by the commission which may have been theretofore applicable to the particular field.

The East Texas field in which the tracts of land involved in the three cases under consideration are situated, became a special rule field on September 5, 1931. Special rule 37 applicable to said field provided for the spacing of oil wells 660 feet apart and 330 feet from property lines, and provided for the same exceptions "to prevent waste" and "to protect vested rights" as did old rule 37. These special rules expired by their own terms on October 31, 1931, and this East Texas field had no rules from that date until February 25, 1932, unless the general rules of the commission, including rule 37 as adopted in 1919, automatically became effective. On February 25, 1932, the special rules of September 5, 1931, were readopted with amendments not material here. On June 13, 1933, after extensive hearings, the commission promulgated a complete set of special rules and regulations for the East Texas field, and the June 13th special rule 37 reads substantially as present special rule 37, promulgated October 17, 1933, reading as follows: "Rule 1. Rule 37, adopted November 26, 1919, is hereby amended insofar as it applies to the East Texas Field so as to hereafter read as follows: 'No well shall hereafter be drilled for oil or gas at any point less than Six Hundred and Sixty (660) feet from any drilling or completed well and no well shall

hereafter be drilled for oil or gas at any point less than Three Hundred and Thirty (330) feet from any property or division line; provided, however,·the Commission, in order to prevent waste, or to protect vested rights, or to protect any property against undue drainage by reason of the operation of the wells of any other operator, will after hearing, grant exceptions permitting drilling within a less or shorter distance than 'hereinabove prescribed, upon application duly filed stating the facts, notice of such application and hearing having been first given to all adjacent lessees affected thereby; provided that if all adjacent lessees affected thereby waive in writing, notice of hearing on or objection to granting said application, the Commission may proceed to determine such· application without hearing; and provided further that in cases of forced offsets the Commission may grant exceptions without waivers or hearing, when it is evident that the wells desired are necessary to protect the properties on which it is proposed to drill them."

It will be noted that the last two complete sets of special rules for the East Texas field have each contained a special rule 37, which has provided for four exceptions to the general spacing rule prescribed, the first two being the same exceptions as have been provided for in old rule 37 since 1923, and the last two being peculiar to the East Texas field to which they specifically relate; and each set of special rules for 'the East Texas field have by express provision and order of the commission abrogated or superseded all general rules of the commission which may have been theretofore applicable to said field. The preamble to the special East Texas rules, adopted June 13, 1933, reads as follows: "It appearing to the Commission, from evidence adduced at the East Texas hearing held in Austin on June 12th, 1933, that Rule 37, limiting the spacing of wells in the East Texas Field, including Upshur, Smith, Rusk, Gregg, and Cherokee Counties, Texas, should be amended in order that properties might be more fully developed so as to insure a maximum oil recovery and to allow owners of various properties in said field to protect themselves against inequities which might result from a strict enforcement of Rule 37."

This practice of the commission of promulgating complete sets of special rules and regulations for particular oil fields is of recent origin, and was evidently made necessary by the enactment of the proration statutes, and particularly by the Act of the 42d Legislature, c. 313 (Vernon's Ann. Civ. St. art. 6014), amending Rev. St. article 6014, defining "waste" to include, among other things, "the production of crude petroleum oil in excess of * * * reasonable market demand." Before this amendment the commission had only· the power to make rules (1) to prevent underground waste as theretofore defined in the statutes; and (2) to prevent waste incident to fire hazard. In its efforts to obey the legislative mandate to prevent "market demand" waste, the commission manifestly undertook in part to do so by promulgating special rules for each field, which provided for the spacing of wells at a much greater distance than did old rule 37, but in the main by limiting and prorating the amount of oil that could be taken daily or within a given time from each well. That the providing for greater spacing distances for wells was only in aid of preventing "market demand" waste is manifest from the evidence adduced on the preliminary 'hearings for the purpose of promulgating the special East Texas rules of June 13, 1933, which showed that the commission extensively inquired into all of the conditions of the entire field not only for the purpose of proration, but with the view of regulating future drilling and development of the field in all its aspects, and which evidence also showed that the evils or causes of underground waste sought to be remedied by the old 1919 rule 37 had been practically eliminated by the enforcement of the proration statutes and the rules relating thereto and other rules tending to prevent underground waste; that is, the evidence adduced at the preliminary hearings and in cause No. 7996 not only showed that a well would not drain a larger area since the enforcement of proration statutes and rules relating thereto, but tended to drain a smaller area, and that since the enforcement of proration and other rules tending to prevent waste, and the supervision by the commission of the drilling of each foot and the taking of each barrel of oil from any well, and with modern drilling machinery and appliances, the various causes for underground waste which had formerly resulted from drilling and producing oil at full capacity flow from wells drilled close together, and which evils old rule 37 at the time it was adopted sought to remedy, had been greatly minimized or eliminated altogether, and that for the same reasons waste incident to fire hazard caused from density of drilling and production of oil from wells at capacity flow, had necessarily been reduced. So it is manifest that the commission could not have extended the spacing distances for wells to prevent

the various causes for waste formerly existing, because the enforcement of the proration statutes and other rules had minimized or eliminated these causes of waste; and it necessarily follows that the spacing distances of wells were extended in aid of proration and the attempt to prevent "market demand" waste, which the commission was attempting to control in the main by proration. And while the drilling of additional wells in a particular field may tend to affect "market demand" waste, still the commission did not intend to stop development, but promulgated elaborate and extensive special rules and regulations for the East Texas field, which authorized the continued development of the field. And with regard to the spacing of wells in this field the commission expressed its intention in the preamble to the June 13, 1933, special rules (above quoted) to not strictly enforce special rule 37, "in order that properties might be more fully developed so as to insure maximum oil recovery and allow owners of various properties in said field to protect themselves against inequities which might result from a strict enforcement of Rule 37."

If, as the majority opinion seems to hold, it is material when one acquires title or the vested rights in the oil and gas estate in land, then the evidence is undisputed that the owners of the three tracts of land involved in these suits (granting that appellees in the instant suit will recover in the other pending suit), acquired their respective titles or vested rights prior to the promulgation of the special rules and regulations for the East Texas field, which by their own terms abrogate and supersede all general rules of the commission, including old rule 37. It is also undisputed that appellant in the instance case has drilled wells within a shorter distance to appellees' property line than even old rule 37 would permit, and has been draining and will eventually drain all the oil and gas from under appellees' land, unless they are permitted or given an equal opportunity to drill and produce the oil underlying their land. The same facts are true with reference to drainage of each of the other tracts involved in these companion cases. The evidence is also undisputed in one of the companion cases (No. 7996) that the commission has granted many similar exceptions in the same field and on even smaller tracts of land than those involved in these cases, under its interpretation of one or the other exceptions provided for in the special rules and regulations applicable to the East Texas field;

and the records and minutes of the commission show that more than 60 per cent. of the producing wells in the East Texas field have been drilled under one or the other exceptions to the general distances prescribed for drilling wells.

It is the view of the writer that the Legislature did not intend to delegate and that it has not delegated the power to the Railroad Commission to promulgate rules and regulations under the provisions of the conservation laws by which property or vested rights in the oil and gas estate in land may be acquired. Such property or vested rights are acquired under article 14, section 7, of the Constitution, which "releases to the owner or owners of the soil all mines and minerals that may be on the same, subject to taxation as other property," and under various legislative enactments authorized by the Constitution, which released, relinquished, quitclaimed, granted, sold, or leased the oil and gas as a part of the land, or as a severable estate in the land to the owners, purchasers, or lessees. Nor has the Legislature authorized the commission to promulgate rules and regulations with reference to which persons must contract in order to acquire the title or vested rights in oil and gas in land. Such far-reaching power finds a safer repository in the fundamental and statutory laws of the state; and the holding of the majority opinion that persons acquiring oil and gas estates in land, whether by conveyance or lease, must contract with reference to rule 37 as promulgated in 1919, is not only wholly untenable for the reasons which will be hereinafter discussed, but such holding is contrary to the constitutional provisions which reserve such power in itself, or in the power delegated by it to the Legislature. Schumer v. Caplin, 241 N.Y. 346, 150 N. E. 139.

The only rule-making power delegated to the commission by the Legislature under the conservation laws is the power to make rules and regulations to prevent certain statutory causes of waste so that the state and the owners to whom it has sold or leased the oil and gas estate in land may ultimately recover same from under their lands, and to so regulate the drilling of wells and the production of oil and gas therefrom as to conserve the rights of adjoining owners. This power given the commission to promulgate rules and regulations to conserve oil and gas against certain statutory causes of waste and to regulate drilling of wells as between adjoining owners so that each may have an equal opportunity to use and enjoy the oil and gas un-

der his land may authorize the commission to determine indirectly some property or vested rights; but the power delegated was intended to operate only with reference to the use to which the owners might employ their property, and not to the manner in which they might acquire it. Nor does it follow that because the commission has been given rule-making power to conserve for the owners the oil and gas estate in land, or to conserve them under the police power as natural resources, or that because such rules and regulations must necessarily operate to some extent civilly, that they should indiscriminately be given unlimited civil effect as the majority opinion holds. Nor does it follow that civil or vested rights in property may be indiscriminately acquired or denied under them. It is only the use of the oil and gas estate in land that is sought to be limited by the conservation rules and regulations of the commission, and not the time nor manner in which one may acquire title or vested rights in such minerals. Since this is true, and since such rules necessarily vary in different oil fields, and since they are subject to frequent variations and change at any time and have no application to "unproven oil fields," the rules in force at the time the oil is sought to be produced should be applied; and the commission has always so construed and applied its spacing rules and regulations. The commission has never assumed the power or authority to deprive any owner of his oil and gas estate in land by any spacing rule for oil wells. Each such rule has from its inception and as a part of it provided for an exception "to protect vested rights."

A vested right or vested rights with regard to the oil and gas estate in land simply means present ownership with right of possession and use. There was some confusion with regard to the question of ownership of oil and gas in place prior to the decision in the case of Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 292, 29 A. L. R. 566, but in that case the Supreme Court clearly and definitely settled the question, holding "that gas and oil in place are minerals and realty, subject to ownership, severance, and sale, while embedded in the sands or rocks beneath the earth's surface, in like manner and to the same extent as is coal or any other solid mineral." The court further held that the gas and oil estate in land was subject to taxation the same as other property; and that owners of adjacent tracts of land had correlative rights to appropriate through like operations the gas and oil under-

lying their respective lands. The Legislature with the view of preventing waste of these natural resources and at the same time of protecting the correlative or "vested rights" of the adjacent owners, so as to permit them to appropriate only the oil underlying their respective lands, authorized the commission to promulgate rules and regulations for said purposes. Pursuant to this authority the commission has promulgated rule 37 and the amendments thereto, each providing for an exception to protect vested rights since its inception. The commission has always interpreted the exception to protect vested rights as authorizing the drilling of one well or more wells on each small tract of land under separate ownership, without regard to the size or shape of the tract and without regard to when the title or vested rights in the tract were acquired, with correlative rights to adjacent owners to drill offset wells. These cases are the first to ever question this interpretation given the exception to protect vested rights by the commission. In so promulgating and interpreting its spacing rules, the commission has simply applied the rule or exception in force at the time the vested rights in the oil and gas were sought to be exercised or used; and manifestly it can make no difference when the owner acquired title or the vested rights in oil and gas in land, if the spacing rule or an exception thereto in force at the time he seeks to drill the well authorized it to be drilled.

Another reason for the aforementioned view of the writer is that the Constitution and statutes of the state can be readily ascertained, and notice of their provisions with respect to how and when civil or vested property rights may be acquired must be imputed to every one. But not so with respect to an administrative commission's rules and regulations, which are frequently confused, obscure, and difficult of ascertainment, and subject to variations and change at any time. Rule 37 as promulgated in 1919, when viewed in the light of its history, its amendments, that the evils sought to be remedied by it have been practically eliminated, and the fact that it has been abrogated or superseded by special drilling and spacing rules for the various oil fields, itself furnishes a concrete example of the difficulties or hazards incident to acquiring vested rights in property under administrative rules and regulations.

If the majority view is correct, and if appellees in these suits were required to take cognizance of and contract with reference to rule 37 as promulgated in 1919, then they would be compelled to ascertain whether their

lands were located in an unproven oil field, or whether, if in an oil field, it was a "salt dome field," because in either instance rule 37 would have no application under its own terms and the construction uniformly given it. But, notwithstanding the rule has no application to unproven fields or salt dome fields, nor the fact that no oil field was in prospect or had been thought of where the lands of appellees are situated until long after rule 37 was adopted, still the majority view requires that they or that "all parties leasing land subsequent to its promulgation * * * must contract with reference to this settled rule." And while old rule 37 has been abrogated since 1931 by the various special spacing rules adopted for the East Texas field in which appellees' lands are situated, still the majority view requires that subsequent "contracts, whether by conveyance or lease, must be entered into and construed in keeping with its terms." And, although the undisputed evidence shows that the evils sought to be remedied by old rule 37 in 1919 had been greatly minimized or eliminated altogether by the enforcement of the proration statutes and rules in aid thereof and other rules, and notwithstanding the commission in its preamble to the special East Texas rules expressed the intention of not strictly enforcing the general spacing rule and provided for four exceptions thereto, still the majority view has announced the unusual doctrine that the commission had no authority to provide exceptions to protect vested rights which would destroy the minimum spacing distances prescribed in rule 37 as adopted in 1919, and that the minimum spacing distances prescribed in said rule 37 as adopted in 1919 and its amendments still remain inviolable and sacrosanct. This holding, which is more clearly reiterated in the majority opinion on rehearing in one of these companion cases, not only usurps the legislative or rule-making power delegated to the commission, but the rule is wholly incorrect, and we pass to a discussion of this point of dissent.

The effect of the majority opinion is to destroy the exceptions to rule 37 as adopted in 1919, and to strike down all the exceptions to special rule 37 applicable to the East Texas field. This is manifest from the announcement of the very unusual doctrine that the commission had no authority to promulgate a minimum spacing rule, and then provide exceptions which would destroy it. The majority opinion also necessarily holds that purchasers or lessees of the oil and gas estates in land can purchase or lease only with reference to the minimum spacing distances for

wells and not with reference to any exception to rule 37 as adopted in 1919, or either special rule 37 adopted for the East Texas field, although the exception to protect vested rights was made a part of each rule since its inception.

It is settled law that, where a statute carries a plain statement that the Legislature intends to allow an exception or exemption from the general rule there laid down, such exception or exemption must be allowed, otherwise the entire act must fall, because the courts cannot know what has been prohibited unless they know what has been excepted or exempted, and they cannot know what has been left inside the law unless they know what has been taken out of it. Cline v. Frink Dairy Co., 274 U. S. 445, 455, 47 S. Ct. 681, 71 L. Ed. 1146; International Harvester Co. v. Kentucky, 234 U. S. 216, 221, 34 S. Ct. 853, 58 L. Ed. 1284; Collins v. Kentucky, 234 U. S. 634, 637, 34 S. Ct. 924, 58 L. Ed. 1510; Connally v. General Construction Co., 269 U. S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322. This results from the fact that, the Legislature having plainly stated its intention to allow an exception or exemption, the courts cannot impute to the Legislature the intention to enact or enforce the statute without the exception or exemption. The Legislature having expressly defined a limited field for the operation of the statutes, the courts cannot give it an unlimited field. That which the Legislature said should be limited cannot be given unlimited effect by the courts merely because the courts may think that the exception destroyed the general rule, because in such event the entire act must fall. The courts cannot give a legislative act a character not given it by the Legislature itself. Davis v. Wallace, 257 U. S. 478, 42 S. Ct. 164, 66 L. Ed. 325; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679; Lewis, Sutherland, Stat. Const. vol. 1, § 305; Ruling Case Law, vol. 6, p. 129, § 127.

This same rule of construction applies to rules and regulations of the commission, because they are given the "force and effect of an enactment of the legislature." And, since the commission has adopted each rule 37 with the exception to protect vested rights and other exceptions stated, the courts cannot take out the exception or exemption and enforce the rules without them, for that would impute to the commission the intention to adopt an unlimited rule, where in fact it actually adopted a limited one. McFarland v. American Sugar Refining Co., 241 U. S. 79, 87, 36 S. Ct. 498, 60 L. Ed. 899.

It is the further view of the writer that, since the commission has adopted each rule 37 with exceptions to protected vested rights and other exceptions stated, which the courts cannot take out of the rule and enforce it without them, and since the undisputed evidence shows that the commission has authorized the drilling of many wells in the East Texas field under similar facts and circumstances and on even smaller tracts of land than the three tracts involved in these suits, under its official interpretation of the vested rights or other exceptions to the general spacing distances prescribed by rule 37 or its amendments applicable to particular fields, and since the records and minutes of the commission show that more than 60 per cent. of the producing wells in the East Texas field have been drilled as exceptions to the general spacing distances prescribed, under the official interpretation given the exceptions by the commission that such official interpretation of the exceptions become a part of the rule and that the rule is susceptible of no other interpretation, the commission being the instrumentality of the state, exercising delegated powers, and its rules being given the same force as like enactments of the Legislature.

In the case of West Texas Compress & Warehouse Co. v. Panhandle & Santa Fé Ry. Co. (Tex. Com. App.) 15 S.W.(2d) 558, it is held that interpretations placed by the Railroad Commission on order or rule of the commission become a part of the rule and the rule is susceptible of no other interpretation.

In the case of Texarkana & Ft. Smith Ry. Co. v. Houston Gas & Fuel Co., 121 Tex. 594, 51 S.W.(2d) 284, 287, it is held that, "where the commission has officially interpreted its own rules and rate orders, such interpretation should be considered a part thereof."

The commission has continuously interpreted the exception "to protect vested rights" as made a part of each rule 37 promulgated from its inception as authorizing the drilling of oil wells on all small tracts of land owned under separate title or where partitioned by the courts. Under its interpretation of the vested rights and other exceptions to the general spacing distances of special rule 37 adopted for the East Texas field, the commission has invariably allowed wells to be drilled on tracts of land owned under separate title, without regard to the size or shape of the tracts, if the title or vested rights in the oil and gas estate were acquired prior to the discovery of the East Texas field in 1930, granting to adjacent owners the right to drill

equidistant spaced offset wells or even an extra well to prevent undue drainage from a closely drilled area or a single well on a small tract of land. It has also allowed wells under like facts and circumstances even though title or the vested rights were acquired after the adoption of the special rule 37 and the discovery of the East Texas field, and has recognized and granted wells on small partitioned tracts without regard to when the partition was had. In the East Texas field more than 60 per cent. of the producing wells were drilled under one or the other exceptions provided in the special rule 37 applicable to that field. Under the decisions above cited and quoted from, the official interpretation of the various exceptions to the general spacing distances prescribed for oil wells becomes a part of the rule and the rule is susceptible of no other interpretation by the commission or by the courts.

All parties to the case of Railroad Commission v. Bass (Tex. Civ. App.) 10 S.W.(2d) 586, as well as this court assumed that the aforementioned interpretation of the exception to protected vested rights by the commission was correct. This interpretation of the exception has never been questioned so far as the writer has been able to ascertain until these cases were presented. And in the Bass Case, this court, in defending rule 37 against the attack that it was violative of the due process clauses of both the State and Federal Constitutions and other constitutional inhibitions, held, in the interest of the rule, that, with its exception to protect vested rights, it was a valid, reasonable, and enforceable rule. The writer is still of the same view, and that the interpretation given the exception and rule in the Bass Case is correct and controls each of the three cases here presented.

In the case of State v. Jarmon (Tex. Civ. App.) 25 S.W.(2d) 936, the court held that the commission could not enjoin nor restrain the owner of a small narrow strip of land from drilling an oil well on it under the exception to rule 37 to protect vested rights, and further held that the state in leasing its lands for oil development was bound by the same rules as other persons. Since this decision the Legislature, its board of mineral development created to lease state lands, and the commission have uniformly interpreted the exception to protect vested rights as allowing persons to drill on small strips as excess or vacant lands. The writer will briefly advert to these interpretations given state leases, most of which courts must take judicial knowledge of, and those not subject to judicial knowledge will no doubt be proved in

these temporary injunction cases on the merits.

In 1931 the Legislature enacted article 5421c, Vernon's Ann. Civ. St. section 1 of which provides for the sale of all school lands and unappropriated and unsold public domain remaining in the state, except river beds, channels, etc. Section 5 provides for patent of surveys, homestead donations, pre-emption surveys, script surveys, and surveys heretofore awarded or sold and held for a period of ten years for payment of $1 per acre. And "in such cases the patent shall be issued to the owner now of record * * * and inure distributively to the true and lawful owners of the land, provided that in all cases where a tract of school land has been occupied by mistake as a part of another tract, such occupant shall have a preference right for a period of six months after the discovery of the mistake * * * to purchase the land at the same price paid or contracted to be paid for the land actually conveyed to him." Section 8 provides for the leasing of such lands for production of oil and gas. Section 8—A provides for leasing river beds and channels "in tracts of such size as the hereinafter created board desires." Subsection 1 creates the "Board of Mineral Development, which shall consist of the Governor, the Commissioner of the General Land Office and the Chairman of the Railroad Commission of this State," with authority to carry out the provisions of the act. Two members of the present Railroad Commission have served on this board. Subsection 6a (Acts 1933, 43d Leg. c. 120, p. 309), declares the intention of the Legislature and the policy of the state to be that the development of such leases shall be in conformity with the valid laws of this state and regulations of any agency of the state applicable to the development by others than the state of petroleum and gas.

The public records of the land office show the interpretation placed upon section 5, supra, by the mineral board to be, for example, as follows: Seven heirs own a tract of land with a vacant strip of seven acres along its side or end, the board under the distribution feature of the statutes subdivides the seven-acre strip in equal parts, or one-acre tracts, and the land commissioner issues a patent to each heir covering his one acre. The Railroad Commission then grants a permit to drill a well on each one-acre tract thus subdivided under the exception to protect vested rights. And the public records of the land office and the minutes of the commission show that, in carrying out the mandate of the Legislature to lease such lands for production of oil and gas, many small tracts have thus been leased and drilled for oil in proven oil fields under the exception to protect vested rights, and that the permits to drill for oil have been granted as soon as the patents are issued from time to time as the vacancies are discovered.

Section 8—A, supra, authorized the mineral board to lease for oil and gas development the river beds "in tracts of such size as it may deem proper," and pursuant to this legislative mandate the board leased to various persons the state-owned river beds. It is a matter of common knowledge that such a state-owned river bed, which under the statutes needs only maintain an average width of 30 feet from its mouth up, cannot be developed if the general spacing distance prescribed by rule 37 or its amendments be enforced. Still the board was instructed to lease river beds, and they have continuously done so; and the public records of the land office and the minutes and dockets of the commission show that of the more than one hundred producing wells on such river beds, about 90 per cent. have been drilled as exceptions to protect vested rights.

It is not thought that the state would thus develop its own lands for oil and gas and deny to its citizens the same rights. And since the Legislature has specifically enjoined upon the board, of which the chairman of the Railroad Commission is a member, the duty of developing under the rules governing other persons, these interpretations become pertinent; and the interpretation given the vested rights exception to rule 37 becomes under the decisions a part of the rule, susceptible of no other interpretation.

The right of joint owners of the oil and gas estate in land to partition is authorized by article 6082, and was so recognized by the courts prior to the enactment of the statutes. The commission has always granted wells as exceptions to protect vested rights on partitioned lands. This principle alone would control both the case of Humble Oil & Refining Co. v. Railroad Commission (Tex. Civ. App.) 68 S.W.(2d) 625, and the case of Lon A. Smith v. Maurice Stewart (Tex. Civ. App.) 68 S.W.(2d) 627, under the interpretation given by the commission to the exception to protect vested rights. The suggestion of fraud in acquiring the joint ownership in small tracts is not determinable on these appeals from orders refusing temporary injunctions, because the evidence does not show fraud. It is not fraud for joint owners to partition their lands, nor a circumvention of rule 37, because exceptions have always been granted in cases of partitioned lands; nor is the ques-

tion of whether a person can willfully divide his land into small strips, or reserve out of a large tract a small strip, and thus circumvent the spacing rules applicable to the facts of these cases. The instant case is the only one in which there was any suggestion or inference that such was done. The question cannot be determined on this appeal from a temporary injunction. In the Maurice Stewart Case the owner did not even know that he owned the smaller tract in suit when he leased his larger adjoining tract.

The writer is of the opinion that the instant case should be disposed of as above suggested, and that the other two companion cases should be affirmed. A copy of this opinion will be filed in each of these cases as the dissenting opinion of the writer.