## MAGNOLIA PETROLEUM CO. v. RAILROAD COMMISSION OF TEXAS et al.

### No. 8612.

Court of Civil Appeals of Texas. Austin.
April 7, 1937.

Rehearing Denied April 28, 1937.

Dissenting Opinion May 6, 1937.

·W. H. Francis and Walace Hawkins, both of Dallas, and Greenwood, Moody & Robertson, of Austin, for appellant.

Wm. McCraw, Atty. Gen., and Harry S. Pollard, Asst. Atty. Gen., for appellee Railroad Commission of Texas.

Upchurch & Hooper and Willis E. Gresham, all of Austin, for appellee Century Refining Co.

Truman Warren, of Tyler, for other appellee.

BAUGH, Justice.

This is a rule 37 case. The Railroad Commission, on April 29, 1936, granted to the Century Refining Company a permit as an exception to rule 37, to drill a well on a narrow strip of land containing 1.6 acres in the East Texas field in Rusk county. This strip ran east and west, being 1,094 feet long, 47.5 feet wide at its west end, and 25 feet wide at its east end. Adjoining it on the north is the 41.7-acre lease of the Ward Oil Corporation; and on the south a 17-acre lease of the Magnolia. The well in question was authorized 401 feet west of the east end of this strip and midway between its north and south boundaries. The permit recited that same was granted to prevent confiscation of property.

The Magnolia, which protested the application before the commission, brought this suit to set aside the permit and enjoin the drilling or operation of said well. From an adverse judgment against it in a trial to the court on the merits without a jury, the Magnolia has appealed.

The Magnolia asserted the invalidity of said permit, among others, on the ground that the owners had voluntarily segregated this 1.6-acre tract from the 41.7-acre tract to the north of it, capable of development as a whole without exceptions, after rule 37 became applicable to this field; that the Railroad Commission had on February 12, 1935, denied the application of the Century Refining Company for a permit to drill two wells on this same strip of land on the ground that it was a voluntary subdivision, that no material change in conditions had occurred between the date of such denial and the date of the second application, and that such denial therefore became res adjudicata of the second application; that the well in question, being only about 20 feet from the lines of the leases to the north and south, would require the drilling of equidistant offsets on each side in order to prevent drainage, and so create such a density of drilling as to cause great waste; that title to this strip together with another similar strip to the east of the 41.7-acre tract was acquired by limitation prior to the lease thereof by the owners for oil, the two strips aggregating in area 5.57 acres, and having been segregated from the 41.7-acre tract, should be treated as one tract; and, since the strip to the east of the 41.7-acre tract, which adjoins the east end of this 1.6-acre tract, already had two producing wells thereon which afforded a fair opportunity to recover an amount of oil equal in quantity to that in place beneath the entire 5.57 acres acquired by limitation and segregated from the 41.7-acre tract, that no additional wells were necessary on either strip of land to prevent confiscation.

The attached map shows the various tracts and the location of producing wells thereon. The circle near the center of said map indicates the location of the well here in controversy:

J. E. Giles executed an oil and gas lease on the 41.7 acres which, by proper assignments, is now owned by the Ward Oil Corporation. On February 4, 1931, in a partition suit to which all of said children were

PLAINTIFF'S EXHIBIT NO. 13.

Plat Showing
Lease Development Surrounding
W. B. Giles Heirs Strip
M. J. PRUE SURVEY, RUSK COUNTY TEXAS

The ownership of the lands in question is somewhat involved. W. B. Giles acquired fee title to the 41.7-acre tract in 1877. He was married at that time, and to him and his first wife, who died in 1886, were born seven children. He subsequently married again and of the second marriage were born four children. All of said children are still living. W. B. Giles died intestate in November, 1929, but shortly prior thereto he and his second wife conveyed to two of his children by his second wife, C. C. and J. E. Giles, an undivided ½ interest in the 41.7-acre tract, with the proviso that any excess therein should be owned jointly by all of his eleven children. On May 20, 1930, C. C. and

parties, an agreed judgment was entered, setting aside to C. C. and B. F. Giles the 41.7-acre tract; and to all eleven of said children jointly the excess (which includes the strip of land here involved) over and above the 41.7 acres. As stated, the title to this excess was acquired by W. B. Giles, the father, by limitation which ripened into title prior to 1919. On October 27, 1934, all of said children joined in a lease of this strip of land to the Century Refining Company. Lease had already been executed by the Giles heirs in 1932 on the strip acquired by limitation to the east of the 41.7-acre tract, two wells drilled thereon, and the agreed facts show that the title to that strip

is in litigation. Prior to the partition, therefore, it appears that the seven children by the first marriage inherited a half interest in the 41.7-acre tract upon the death of their mother; that two of the children of the second marriage owned the other half interest therein through a conveyance from their father; and that all the eleven children and the surviving wife (the character and extent of whose interest therein not being here in question) owned jointly the strip of land here involved. In a suit between the Ward Oil Corporation, as plaintiff, and the Century Refining Company and the Giles heirs as defendants, . the Ward Oil Corporation was awarded a 2/11 interest (obviously acquired through C. C. and B. E. Giles) in the lease on this 1.6-acre tract, and the Century Refining Company a 9/11 interest therein. Thereupon a working agreement with reference to the drilling of said well by the Century Refining Company on the 1.6 'acres, and its operation thereafter by the Ward Oil Corporation, was entered into between these two corporations on February 11, 1936, prior to the granting of the permit here in controversy.

We do not understand appellees to contend that the partition agreement of February 4, 1931, did not constitute a subdivision of the strip in question from a larger tract under common ownership capable of development as a whole without the necessity of exceptions to rule 37, but their argument is that because of the working agreement made between the Ward Oil Corporation and the Century Refining Company, this strip, for development purposes, should be treated as if it were a part of the Ward 41.7-acre tract; and that when so considered under our holding in Humble Oil & Refining Co. v. Railroad Commission, 68 S.W.(2d) 625, because of the number of wells thereon, as compared with the number on surrounding leases, including the 17-acre lease of the Magnolia, they are entitled to more wells than had been drilled on such aggregate acreage, in order to obtain their fair share of the oil in place beneath it. That is, that if the 41.7 acres plus the limitation title strip to the east containing 3.96 acres on which there are two wells, and the strip of 1.6 acres here involved, without the well in issue, be treated as one tract, there are only nine wells thereon, or a density of one well to more than 5 acres. Whereas, on the Magnolia tract of 17 acres to the south there are six wells, a density of one

well to 2.86 acres; and on the Ortiz lease to the east eight wells on 16.12 acres.

■ If the well in question had been authorized on this basis and had been located accordingly, this theory might be sustained. But the well in question was not so applied for nor was it so granted. Had the Ward Oil Corporation (which owned a 2/11 interest in the Century's lease on this strip, in addition to its lease on the 41.7-acre tract) joined with the Century Refining Company's application with such objective, a different situation would be presented. But only the Century Refining Company sought a permit, and that for the development of the 1.6-acre tract only; and this application was protested by the Ward Oil Corporation before the commission. The working agreement between the two corporations clearly discloses that its purpose was, not to enable the Ward Oil Corporation to secure a greater development of its 41.7-acre tract, but to protect its 2/11 interest in the 1.6-acre lease against the Century Refining Company in the latter's development of that tract. We find nothing in this agreement to prevent the Ward Oil Corporation from seeking an offset to the well in question on the north to prevent undue drainage of its tracts, just as the Magnolia would probably do on the south. The record clearly discloses we think, that the confiscation which the commission undertook to prevent as the support of its order is referable solely to the 1.6-acre tract in question, and to the lease of the Century Refining Company thereon, separate from and independent of the 41.7-acre tract to the north thereof. This is further demonstrated by the fact, as shown by the attached map, that disregarding this strip and treating it as a part of the 41.7-acre tract owned by the Giles heirs, there were already drilled three wells to the north of it and three wells to the south of it staggered at approximately equidistant locations from the common dividing line.

Under the facts and circumstances above stated, the rules announced by this court in Humble Oil & Refining Company v. Railroad Commission, 68 S.W.(2d) 625, approved by the Supreme Court and repeatedly adhered to in subsequent decisions unnecessary to cite here, and the amendment promulgated by the commission itself on May 29, 1934, predicated upon these decisions, wherein it is provided that the commission would not consider such subdivisions of property made subsequent to the

promulgation of the original spacing rule on the question of confiscation of property, we conclude that the permit in question was not authorized and is therefore invalid.

Appellees urge that under the statute the order of the commission granting the permit is prima facie valid; that the appellant had the burden of proving that the well was not necessary either to prevent waste or to prevent the confiscation of property; and that appellant had not discharged this burden. As to confiscation, what we have already said disposes of this issue. When appellant showed that the permit was granted in contravention of the decisions of the courts as to this particular field, and in contravention of the commission's own promulgated general rule prohibiting such a permit, manifestly it met this burden on the confiscation issue. On the question of waste, the general rules of the commission as we have heretofore held amount to a finding that such would be the result under the facts of the instant case. A permit or order authorizing a particular well as an exception to the general rule defining what constitutes waste cannot rise to the dignity of a general rule, promulgated after extensive hearings, which is prospective and legislative in character and applicable to the field as a whole. The very fact that an exception is necessary to authorize such well at all shows that it is in derogation of such general rule which forbids it; and unless facts exist which remove it from the operation of the general spacing rule it cannot be sustained. As stated by this court in Sun Oil Co. v. Railroad Commission, 68 S.W. (2d) 609, and in Atlantic Oil Pro. Co. v. Railroad Commission, 85 S.W.(2d) 655, the spacing distances provided in rule 37 necessarily implies a finding by the commission that wells located at lesser distances from each other than those prescribed by the rule, and producing equally, will tend to cause waste. If this were not so, the rule would be without basis to sustain it. It also necessarily constitutes a finding that, as applied to the field generally (and the subsurface conditions common to the field were shown to exist in the area here involved), a well will drain an area within a radius of 330 feet of such well. We take it that the wells to the north and those to the south of this strip were located when rule 37 provided spacings of 150–300 feet. At the time this well was authorized, however, the rule prescribed spacings of 330–660 feet. Manifestly a well located within 20 feet of the Magnolia's line, both under the evidence introduced and under rule 37 itself, would drain oil from beneath the Magnolia's lease and affect its property rights within the meaning of the statute authorizing it to bring this suit.

The Ward Oil Corporation is not a party to this appeal. It has not asserted that this 1.6-acre tract should be treated as a part of its 41.7-acre lease for development purposes. The fact that it protested before the Railroad Commission the granting of the permit here attacked indicates the contrary. Obviously the Railroad Commission in passing on the application here involved considered and acted upon it as applied to the 1.6 acres above, and independent of the Ward 41.7-acre lease. That being true, the Century is in no position to assert that a disparity in density of drilling exists between the Ward tract and the Magnolia tract. That is a matter for the Ward Oil Corporation to assert with reference to its tract as a whole, and it is not here complaining. If the commission had granted an additional well on this basis, treating the 41.7 acres and the 1.6 acres as one tract, in the light of the wells already drilled on the 41.7 acres, no valid reason exists under its own rules for placing such additional well within 20 feet of the boundary line of appellant's lease, and within less than 330 feet of four other wells already drilled.

Having reached the conclusion that the only support upon which the permit granted, under the undisputed facts, can rest, is that it was necessary to protect rights of the Century Refining Company in and to this 1.6-acre tract, considered separate and apart from adjacent leases; that the Railroad Commission granted it on that ground and for that purpose; and such strip being a voluntary subdivision, segregated in 1931 from a larger tract capable of development as a whole without the necessity of such exception; we conclude that no well was authorized thereon. That being true, the other contentions made on this appeal become immaterial and need not be further considered.

The judgment of the trial court is therefore set aside and the permit granted by the Railroad Commission is held invalid for the reasons stated. Since, however, the judgment was not superseded on this appeal, and the record does not disclose what action has been taken by the Century Refining Company since the trial hereof, the judgment is reversed and the cause remanded to the trial court with instructions to enter such orders in accordance with this opinion as the facts and circumstances may warrant.

Reversed and rendered in part and in part reversed and remanded.

BLAIR, Justice (dissenting).

Again the writer finds it necessary to disagree with the interpretation of rule 37 by the majority of this court. From the date of the discovery of the East Texas Oil field in the fall of 1930, until September 2, 1931, drilling operations were controlled under the so-called state-wide rule 37, promulgated in 1919, which provided for regular locations and drilling of oil wells without a permit from the commission, at distances of 150 or more feet from property lines and of 300 or more feet from other wells; and further provided that the commission grant permits to drill wells at closer distances than prescribed by the rule, in order to protect vested rights and to prevent waste of oil and gas. Special rule 37, as amended on September 2, 1931, and each subsequent amendment thereto applicable to the East Texas Oil field, have provided for regular locations and drilling of wells without a permit from the commission at distances of 330 or more feet from property lines and of 660 or more feet from other wells; and each has provided that the commission grant permits to drill wells at closer distances than prescribed by the rule, "in order to prevent waste and to prevent confiscation of property." The majority view or court's interpretation of special rule 37 applicable to the East Texas Oil field has been and is now diametrically opposed to the interpretation continuously placed upon it by the commission who promulgated it and is charged with the duty of administering it. This conflict of interpretation and administration of the rule has led to much confusion and to a deluge of litigation; all of which should be brought to an end. As reiterated in the instant case, the court's interpretation of the rule in disagreement is as follows: "The spacing distances provided in Rule 37 necessarily implies a finding by the Commission that wells drilled at closer distances from each other than those prescribed by the rule, producing equally, will tend to create waste. If this were not so, the rule would be without basis to sustain it."

No language of the rule supports a fact finding that wells drilled closer than the distances prescribed by the rule will cause physical waste of oil or gas. The majority reason that since the rule provides for certain minimum spacing distances, wells drilled at closer distances will cause waste. In reasoning toward its holding, the court has assumed what it sought to prove by substituting its own interpretation of the rule as an actual fact finding that wells drilled at closer distances than the rule prescribes will cause physical waste of oil and gas, which finding is contrary to the facts found by the commission after many hearings on the very issue involved. Under the court's interpretation of the rule, an exception granted to prevent waste must always be stricken down if the authorized well is closer than 660 feet to another well, irrespective of factual proof showing that the well is necessary to prevent waste. Accordingly, the court pseudo administratively holds that no well can ever prevent waste, if it is less than 660 feet from another well; and, in consequence, the exception providing that wells may be drilled at closer distances than prescribed by the rule, "in order to prevent waste," has been effectively repealed by judicial legislation. This interpretation of the rule has been continuously made and applied by the majority view despite the settled law that where a statute carries a plain statement that the Legislature intends to allow an exception or exemption from the general rule laid down, such exception or exemption must be allowed; otherwise the entire act must fall, because the courts cannot know what has been excepted or exempted, and they cannot know what has been left inside the law unless they know what has been taken out of it. Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146.

The majority interpretation was first impliedly made in the Sun Oil Company Case, 68 S.W.(2d) 609, and Brown Case (Humble Oil & Refining Co. v. Railroad Comm.) (Tex.Civ.App.) 68 S.W.(2d) 622, wherein the court say in substance that the commission is not authorized to promulgate a rule for minimum spacing distances of oil wells, and then by the same rule provide for exceptions thereto which would destroy the rule. Immediately after these cases were affirmed by the Supreme Court, [Bennett v. Sun Oil Co., 126 Tex. 269, 84 S.W.(2d) 693; Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.(2d) 935, 87 S.W.(2d) 1069, 99 A.L.R. 1107, 101 A.L.R. 1393], the commission, by its order of August 26, 1935, took issue with the court's interpretation of the rule, declared that it had never interpreted nor intended the rule as a fact finding that wells drilled at closer distances than therein prescribed would cause physical waste of oil and gas; and further found

as follows: "We find from the evidence the more wells that are drilled the greater will be the ultimate recovery of oil and gas from any given pool."

This specific finding of fact by the commission was called to the attention of this court in the cases of Railroad Comm. v. Marathon Oil Co., 89 S.W.(2d) 517, and Atlantic Oil Production Co. v. Railroad Comm., 85 S.W.(2d) 655; but the court dismissed the matter with the statement that while the finding cast grave doubts upon the value of the rule as a waste preventive measure, still the commission had not repealed it; and the court has continued to enforce it as formerly. See, also, Stanolind Oil & Gas Co. v. Railroad Comm. (Tex.Civ.App.) 96 S.W.(2d) 664. By recitals in several subsequent orders interpreting and explaining its finding of August 26, 1935, the commission has continuously insisted that it has never interpreted any rule 37 as a finding of fact that wells drilled at closer distances than prescribed by the rule would cause waste of oil and gas. It has continuously found upon evidence adduced at its many hearings and from its actual experience, and through its experts continuously employed in the administration of the rule, that the closer wells are drilled the greater will be the ultimate recovery of oil and gas from the area so drilled, provided the wells produce equally; and closer spacing is accomplished through the application of the exceptions to the general rule to prevent waste, or to prevent confiscation, because oil and gas left in the ground which could be recovered by more densely drilling necessarily results in waste of the oil and gas not recovered; and in consequence also results in confiscation of property through failure to enforce the exception to the rule so as to recover the greatest amount of oil and gas under any given tract of land or area. Orders of August 26, 1935, and February 24, 1936, and other orders under the same docket number of the commission. All of these orders constitute findings of fact by the commission, which are binding upon this court. By its continuous interpretation of the rule, as above quoted, the court has refused to recognize any facts found by the commission contrary to that interpretation; but has continuously substituted its own fact-finding interpretation of the rule for the actual fact findings of the commission. Obviously, the court has thereby substituted its own administration of the rule for that of the commission. And if by court edict

the commission is powerless to make findings of fact and to decide under what conditions underground waste of oil and gas may occur, and to enact, interpret, and enforce rules and regulations to prevent such waste, then the situation is hopeless, because a cursory review of what has happened is sufficient to show that courts are impotent to administer the rule. For instance, the sum total of all wells denied by the court under its interpretation of the rule is in the neighborhood of fifty. Many months were required by the trial courts and this court to determine these cases, not to mention the enormous expense of such litigation. Production of oil from several of these wells has been granted by the commission, on the ground of changed conditions arising after the permits were first granted and held invalid by this court; and appeals are now pending in this court as to the new order or permit to produce. On the other hand, the commission has continuously refused to accept the court's interpretation of its rule; and of the approximately 23,000 wells in the East Texas Oil field all but about 200 are now located at distances which are closer than the minimum distances prescribed by the rule. This has been accomplished through the allowance of wells to prevent confiscation of property, or to protect vested rights, or to prevent waste under the finding of the commission that the more wells drilled in any given area the more oil and gas will be ultimately recovered, provided the closer spacing is approximately uniform throughout the area or field. Maps and plats are now before us in the instant and other cases under submission, which show the drilling development of the entire East Texas Oil field, and show the spacing distances between the approximately 23,000 wells. They show that while in a few small areas throughout the field drilling has been denser than contiguous areas, due to fee ownership of small tracts of land and drilling to protect vested rights or to prevent confiscation, with a gradation of density of drilling outward from these tracts, and with development throughout the field under the finding of the commission that the more wells drilled the greater will be the ultimate recovery of oil and gas, until when viewed from its entire length and breadth the East Texas field is now drilled with approximately uniform spacing at closer distances than are prescribed by the rule. Thus the conflict of interpretation and administration between the commission and the court is clearly shown.

Other facts and circumstances show this conflict, and show the incorrectness of the court's interpretation and administration of the rule; and that if the court's interpretation had been accepted by the commission and applied by it, immeasurable waste of oil and gas would have resulted in the East Texas field through failure to develop the field so as to recover the greatest amount of recoverable oil and gas. Some of these facts and circumstances will be discussed.

The majority interpret the rule to mean that wells drilled at closer distances to each other than 660 feet ·will tend to create waste. Several thousand of the wells in the East Texas field were drilled under the 150-300-foot spacing rule before the amendment providing for 330-660-foot spacing in 1931. So, by its interpretation of the 330-660-foot rule as above stated, the court makes the commission impliedly find that each well drilled under the first rule is since the amendment daily creating waste. It does not stand to reason that the commission would develop the field by drilling several thousand wells under the 150-300-foot spacing rule, and then, by amending that rule providing for wider spacing· of wells, impliedly find that all wells drilled under the first rule would thereafter continuously create waste of oil and gas. Likewise, the court's interpretation of the rule is necessarily a finding that each of the almost 23,000 wells now drilled at closer distances than the minimum spacing distances prescribed by the present rule applicable to the East Texas Oil is continuously creating waste; and still nothing is done about it.

The commission found by its order of August 26, 1935, and by its subsequent orders under its same docket number, interpreting and explaining the meaning of rule 37 as applied to the East Texas Oil field, that the more wells drilled in conformity with approximate uniformity and producing equally or ratably, the greater will be the ultimate recovery of oil and gas from any given tract of land, area, or field; and that by such density of drilling waste will be prevented by not leaving large quantities of oil and gas in· the ground. Obviously, these specific findings of fact should be given more weight by the court than its mere interpretation of the rule as an implied finding of fact by the commission that wells drilled at closer distances than the minimum distances prescribed in the rule will tend to create waste of oil and gas. These orders also constitute interpretation of rule 37 from

time to time by the commission who promulgated it, amended 'it, and have accordingly continuously administered it. These departmental findings of fact and its interpretation and application of the rule it promulgated and is charged with the duty of enforcing should prevail, and particularly so since vast property rights have been accrued under the commission's interpretation and application of the rule, Magnolia Petroleum Co. et al., Relators, v. New Process Production Co. et al., Respondents (Tex.Sup.) 104 S.W.(2d) 1106, decided. April 28, 1937. Both the commission and the Attorney General have been continuously before us insisting that the majority interpretation and application of the rule is incorrect. These officials. take the same oath of office as do the judges. They are manifestly in the better position to know the facts upon which rule 37 is predicated than are the judges;. and such fact finding. is the function of the commission and not of the court. The departmental interpretation and application of the rule should also prevail under the settled rule that where the language of a statute, or a regulatory rule having force and effect of a statute, is vague, indefinite, or ambiguous, great weight is given to the departmental interpretation and application of the statute or rule. McCallum v. Associated Retail Credit Men (Tex.Com.App.) 41 S.W.(2d) 45. In the Sun Oil and Brown Cases, supra, the Supreme Court stated that the exceptions to prevent waste and to protect vested' rights were vague and indefinite, but not to such an ·extent as would render the rule unconstitutional for that reason. And· it may here be noted that the Supreme Court has never interpreted rule 37 as excluding from its operation the exception to prevent waste, but in each of the following cases has expressly referred to the fact that it provided for such ·exception: The Sun Oil Case, supra, Stewart Case, infra, and Brown Case, supra; Magnolia Petroleum Co. v. Railroad· Comm. (Tex.Sup.) 96 S.W.(2d) 273.

If the findings of fact contained in the aforementioned orders of the commission are not binding on the courts without further proof, then the evidence adduced in this and several other cases now under submission in this court abundantly supports the findings of the commission that the more wells drilled in conformity with its stated rule the greater will be the ultimate· recovery of oil from any field.

or pool; and that density of drilling prevents waste and confiscation by not leaving large quantities of oil and gas in the ground. This evidence is summarized in several able briefs filed by the Attorney General in said cases, substantially as follows:

The commission has never interpreted nor intended any rule 37 as a fact finding that wells drilled at closer distances to each other than the minimum distances prescribed will tend to cause physical waste of oil or gas. Such rules merely fix arbitrary patterns or distances for regular locations and drilling of wells without permits from the commission, with exceptions to develop the field, tract of land, or area downward, under the control and permits of the commission so as to ultimately recover the greatest amount of oil and gas possible. It has been practically demonstrated, as well as scientifically proved, that the closer wells are drilled, or the more wells that are drilled, the greater will be the ultimate recovery of oil and gas, although the profit from their operation and production will decline proportionately because of increased drilling costs and expenses, which relate to economic development and with which neither the oil and gas conservation statutes nor the regulatory rules in aid thereof authorize the commission to deal; but its task is confined solely to the prevention of physical waste of oil and gas through orderly development and proration. To be added to the finding that the more wells that are drilled the greater will be the ultimate recovery of oil and gas, is the proviso that the wells be drilled substantially or approximately at uniform distances, and that they produce equally or ratably, based on the potential or producing ability of each well. This substantial or approximate uniformity of spacing and production, operating in pari materia, prevents waste by permitting the greatest utilization of the reservoir pressure and other factors leading to the greatest ultimate production of oil and gas from the given reservoir or pool. In fields like the East Texas field, having their primary source of reservoir energy derived from a hydrostatic head or water pressure, the uniformity of spacing and production greatly promote and effectuate the orderly and uniform encroachment of the water, for the purpose of maintaining and utilizing to the greatest practical extent the pressure which it furnishes and its flushing action in cleansing the oil sands of the oil and gas. It seems to be conceded by the petroleum engineers that the drainage power or force of an oil well is greatest at its base, and that its effective drainage influence lessens as the distance from the base of the well is increased. They all agree that it requires or exhausts more reservoir energy to force oil 660 feet to a well than 100 feet to a well; besides large quantities of oil as well as reservoir pressure are lost in crevices, lakes, and other variants in going the greater distances to wells. Data and maps showing the effect of well spacing in the East Texas field are before us. They reflect that as the ultimate production of a well decreases, as the result of a closer spacing of wells, the ultimate recovery per acre increases. The bottom-hole pressure decreased rapidly during the first two years under wider spacing of wells in the East Texas field. In July, 1933, when some 10,000 wells had been drilled, the bottom-hole pressure in the East Texas field was 1,201 pounds per square inch. Since July, 1933, to the date of the trial of some of the cases before us, with approximately 23,000 wells drilled, there has been produced approximately three-quarters of a billion barrels of oil, and bottom-hole pressure is still 1,147 pounds, thus showing a decline of only 54 pounds. The evidence is not disputed that the decline of reservoir pressure in the East Texas field has steadily diminished per million barrel production as the number of wells has been increased under the controlled development of closer spacing, as interpreted and authorized by the commission. Under the rule of wider spacing of wells first applied to the field, engineers estimated that the ultimate recovery would have been one billion barrels of oil. With conservation of the reservoir pressure by density of drilling, more than 1,000,000,000 barrels have been recovered, and the engineers now estimate that 4,000,000,000 barrels of oil will ultimately be recovered from the East Texas field under the closer drilling rule. Thus it is shown that immeasurable waste would have resulted if the commission had accepted and applied the wider spacing of wells under the court's interpretation of the rule, caused by leaving large quantities of oil in the ground.

The able opinions of Chief Justice McCLENDON and Associate Justice BAUGH reflect the inherent nature of courts to define accurately all rules or standards of conduct; but standardized rules do not fit administrative matters. Rules governing administrative matters must be flexible to accomplish the desired purpose. The so-called oil and gas conservation statutes and the regulatory rules in aid thereof represent the first attempt of this state to control the production and market demand of any commodity of trade or commerce through the exercise of its police power; and necessarily many novel and difficult legal problems have arisen concerning this experimental adventure. The courts have sustained these statutes, and particularly rule 37, solely upon the ground that they tend to prevent physical waste of oil and gas. The enforcement of these statutes and rules is necessarily administrative; and as has often been held by this court, it is the peculiar function of the commission to determine from the facts and its rules and regulations whether a permit should be granted to drill an oil well as an exception to rule 37, in order to prevent confiscation of property or to prevent waste. The same rule applies to the exception for closer drilling to prevent waste of oil and gas.

This is in accord with the often-repeated rule that any order of the commission as to any matter within its jurisdiction shall be accepted under statutory provision as prima facie evidence of its validity. This means that when the order is challenged the court will presume it to be valid and will sustain it, unless the evidence clearly shows it to be unreasonable and unjust. The mere fact that the order in question may be unwise will not warrant a court in striking it down, so long as it is based on any substantial evidence. Falvey v. Simms Oil Co. (Tex.Civ.App.) 92 S.W. (2d) 292.

So, under the facts of the instant case, the commission was authorized to grant the permit to drill the well in question under the exceptions to the rule to prevent waste or to prevent confiscation, and under its settled finding and policy to more densely drill the entire East Texas field in order to obtain the greatest ultimate recovery of oil and gas; and because recoverable oil left in the ground will result not only in waste, but also confiscation by failure to permit denser drilling for it.

The writer is also unable to agree with the holdings of the majority that the permit was invalid because the 1.6-acre tract on which the well was authorized had been voluntarily subdivided from a 41.7-acre or larger tract after the effective date of the spacing rule; and that the 1.6-acre tract, if considered as a part of the original tract, was not entitled to the well (1) because the "well was not so applied for nor was it so granted"; and (2) because the permit could not be granted on the 1.6-acre tract as a part of the 41.7-acre tract, unless the lessee of the larger tract joined in the application and agreed not to drill offset wells.

No rule of the commission required the lessee of the larger tract to join the lessee of the smaller tract in its application for the permit. The lessee of the larger tract was notified of the hearing on the permit and was present and protested; but it has not appealed from the order granting the permit. The matter of whether it will apply for offsets is not in the record; but even so, such is a matter for the commission and not for the courts to determine in the first instance. The commission and the Attorney General are here insisting that the commission's order granting the permit can be and should be sustained on the ground that the 1.6-acre tract, considered as a part of the larger tract, was entitled to the well not only to prevent confiscation of property, but also to prevent waste of oil and gas. The evidence above detailed would sustain a finding of the commission that the well was necessary both to prevent confiscation of property and to prevent waste of oil and gas under the 1.6-acre tract considered as a part of the larger tract. And it is not material whether the application for the permit or the order of the commission granting it specifically authorized the permit for the well on the 1.6-acre tract as a part of the original tract.

This court has held that where parties voluntarily subdivide their lands in an effort to circumvent the spacing rule in question, they are relegated to their rights as they existed prior to the creation of such situation. Humble Oil & Refining Co. v. Railroad Comm. (Tex.Civ.App.) 68 S.W.(2d) 625. See, also, Magnolia Petroleum Co. v. Blankenship (C.C.A.) 85 F. (2d) 553. This court has also held that the conservation statutes provide that every rule, regulation, or order of the commis-

sion shall be deemed prima facie valid; and that if an order granting a permit to drill an oil well can be sustained on any ground other than the ground recited in the order itself, the courts must uphold the permit. Smith v. Stewart (Tex.Civ.App.) 68 S.W.(2d) 627; Sun Oil Co. v. Railroad Comm. (Tex.Civ.App.) 68 S.W.(2d) 609, and many other cases.

Moreover, the review by the courts of an order of the commission granting a permit to drill an oil well under an exception to rule 37 is by statutory enactment a proceeding in the nature of a trial de novo. The appeal or court review is not for the purpose of again trying the administrative matters before the commission; but the court review is for the purpose of determining whether the commission has stayed within the conservation statutes and the regulatory rules in aid thereof in making its order granting the permit, and whether there is substantial evidence to sustain the order. The evidence adduced on the trial de novo must, of, course, be limited to matters arising prior to or at the time of the hearing of the application for the permit; but is not confined to evidence adduced on the hearing for the permit. And in this character of proceeding the courts are not concerned with either the form of the application for the permit, or the order of the commission granting it, but look only to the substance of the order to ascertain if it is authorized by the statutes or rules in aid thereof, and to determine whether there exists any substantial facts sustaining the permit under one or the other exceptions to rule 37 authorizing the drilling of oil wells at closer distances than the minimum distance prescribed by the rule.

The cases are legion and uniform in holding that the procedure before administrative boards or commissions is informal and not confined by technical rules; that generally speaking, no strictness of pleadings is required and pleadings are not to be tested by technical rules governing judicial procedure, because of the impelling necessity that administrative proceedings be informal and liberal in order that substantial justice may be done, and that the purposes of the administration may be accomplished. The courts also hold that administrative bodies have the power to frame their orders as the substantial justice of the case may require, irrespective of the relief sought by the pleadings; and that an alleged insufficiency of pleadings before an administrative board or commission is immaterial where no prejudice to a party has resulted.

Applying the aforementioned rules to the facts of the instant case, the permit to drill the well on the 1.6-acre tract, considered as a part of the larger tract, can and should be sustained by this court. It has been repeatedly held that the oil and gas conservation statutes confer the power on the commission to make rules and regulations necessary to carry out the purpose of the statutes. Rule 37 does not itself prescribe the form of an application to drill an oil well as an exception thereto, "in order to prevent waste and to prevent confiscation of property." The commission has under its rule-making power prescribed a form of application for such a permit, and for notice and hearing thereon. It is designated "Form 1 Application," and the same form is used for obtaining a permit either under the exception to prevent waste or to prevent confiscation. It requires that certain information shall be given in the application. If that information were given in the instant case, which must be assumed under the statutory provision that every order of the commission shall be deemed prima facie valid, then sufficient facts were presented in the application to authorize the commission to grant the permit to drill the well on the 1.6-acre tract, considered as a part of the larger tract, and in order to prevent waste or to prevent confiscation of property. The case was also tried de novo on the pleadings and sufficient proof that as of the time the permit was granted, the well was authorized on the 1.6-acre tract considered as a part of the larger tract, in order to prevent confiscation and to prevent waste of oil and gas.

So the question of whether the Century Refining Company's 1.6-acre tract constituted a subdivision in violation of rule 37 is unimportant; and likewise, it is unimportant whether the application of Century Refining Company for the permit to drill the well specified that the 1.6-acre tract should be drilled as a part of the larger acreage. It contained all the information necessary for such permit. On the trial de novo, the trial court, looking through form to substance for the purpose of disposing of the matters involved on their substantial merits, did so consider the 1.6-acre Century Refining Company's

tract; and upon this consideration upheld the order of the Railroad Commission herein under attack as being necessary in order to prevent confiscation of property of the 1.6-acre tract considered as a part of the larger acreage.

The commission in defense of its order pleaded that its permit for the well should be sustained upon the ground that it was necessary to prevent waste and confiscation of the oil under the 1.6-acre tract considered as a part of the 41.7-acre tract. It would, therefore, be a supererogatory act to remand the case to the commission merely to permit an amended application for the well on the ground that as a part of the larger tract it was entitled to the well. Thus a fetish would be made of form; and such procedure would give one litigant an extreme advantage over another, which courts of equity should not permit.

The commission's order is amply sustained by the evidence which discloses without contradiction that the combined acreage does not have an opportunity to produce and recover the recoverable oil underlying the tract because of the greater density of drilling of the adjacent tracts, including that of the Magnolia Petroleum Company, as of the time the permit was granted.

The writer also disagrees with the majority in reversing and remanding this cause with instructions to the trial court to cause the well to be plugged in accordance with the opinion of this court. Neither the pleadings nor proof alleged any ground for plugging the well, or that the failure to plug the well would cause any physical waste of oil or gas, or any reasonable danger thereof. The exclusive jurisdiction to administer the oil and gas conservation statutes and the regulatory rules in aid thereof is vested in the Railroad Commission, and it has been so consistently announced and repeated by the numerous cases decided by this and other courts. Article 6029, R.S. (as amended by Acts 1935, c. 76, § 4 [Vernon's Ann.Civ.St. art. 6029]), requires that the Railroad Commission shall make and enforce such rules and regulations for the conservation of crude petroleum oil and natural gas, and for the purpose of preventing waste thereof. Among other provisions, the commission is required for the purpose of preventing such waste to cause dry or abandoned wells to be plugged; and while the commission's rule provides that wells drilled in violation of the rules of the commission and without a special permit obtained in the manner prescribed by the rule shall be plugged, it is manifest that such rule must be construed and considered in the light of that statute, which only provides for the plugging of dry and abandoned wells in aid of the prevention of waste of oil and gas. Manifestly, the commission's rule for plugging wells is not mandatory and cannot be enforced merely as a penalty or punishment against one who has drilled a well in violation of some rule or regulation of the commission. In the instant case, the well was drilled upon the permit of the commission. It is clear that the matter of plugging the well is an administrative matter which has been delegated to the Railroad Commission by the Legislature, both with respect to a determination of whether it is necessary for a given well to be plugged in order to prevent the danger of waste of oil and gas, as well as the mechanical details connected with the plugging operation. In the exercise of its administrative discretion concerning the necessity or lack of necessity requiring the plugging of any oil and gas well for the purpose of preventing waste or the danger of waste of oil and gas, the commission must function reasonably and with discretion, and not capriciously nor arbitrarily. In which event, the commission's act is subject to judicial review by the court as provided by article 6049c, § 8, Vernon's Annotated Civil Statutes.

Due to changing conditions, a well not authorized to-day may be authorized to-morrow. Magnolia Petroleum Co. et al., Relators, v. New Process Production Co. et al., Respondents (Tex.Sup.) 104 S.W. (2d) 1106, decided April 28, 1937. The development of an oil field does not stand still, and a thing that is not right today, may be right tomorrow, and for that reason the commission may as effectively seal a well and prohibit its operation as against the time that conditions so change that it may become necessary to operate the well; and certainly where a well has been drilled under a permit of the commission, even though it has been contested in court, the driller should not be punished by destroying his investment in the well drilled; but the well should be sealed and operation of it prevented until such time as the changed condition might authorize its operation. Neither the statute nor the rule with regard to plugging a well would authorize

or require the harsh remedy sought by appellant and applied by the court in this case.

The writer respectfully disagrees with the decision of the majority in this case; and is of the view that the order or permit in question should be sustained and the judgment of the trial court affirmed.