**RAILROAD COMMISSION et al. v. SHELL
OIL CO., Inc., et al.**

No. 9125.

Court of Civil Appeals of Texas. Austin.
June 25, 1941.

Corrective Opinion Sept. 24, 1941.

Dissenting Opinion Oct. 8, 1941.

508

Gerald C. Mann, Atty. Gen. and Edgar W. Cale and James P. Hart, Asst. Attys. Gen., for appellant Railroad Commission of Texas.

Wheeler & Wheeler, of Austin, for appellant Trem Carr.

H. E. Bell, of Houston, Powell, Rauhut & Gideon, of Austin, Joe T. Dickerson, of Tulsa, Okl., R. H. Whilden, of Houston, and Greenwood, Moody & Robertson, of Austin, for appellees.

BAUGH, Justice.

This is a Rule 37 case. The well involved was drilled under a permit granted on October 1, 1937, to prevent confiscation of property. On appeal to this court this permit was set aside as invalid. See Richey v. Shell Pet. Corp., Tex.Civ.App., 128 S.W.2d 898. It was granted to Ida Richey, but it was not controverted that Trem Carr then owned the leasehold on the .67-acre tract involved, and that it inured to his benefit. On February 20, 1940, the Commission granted to Trem Carr a permit to drill well No. 1 on this same .67-acre tract. While granted as a permit to drill, it was in reality a permit to produce oil from the well already drilled, which permit was set aside in the former suit. In the instant case it was granted on the recited grounds, "to prevent confiscation of property and to prevent physical waste."

No contention is made here that the permit can be sustained on the ground of confiscation. Not only was that issue adjudicated on the former appeal (there being no intervening material change of conditions), but the evidence on the trial of the instant suit clearly negatived the necessity for such permit to prevent confiscation. It is contended, however, that there was substantial evidence before the Commission on the subsequent hearing to sustain the permit as necessary to prevent physical waste.

■ It is now settled that the question of confiscation involves primarily the private property rights of the adjacent leaseholders, is one essentially judicial in nature, and is not dependent upon whether waste of the natural resources will result or not. On that issue the exceptions to Rule 37 are grounded primarily on the duty and undertaking of the State, through the Railroad Commission, to see to it that one producer of oil shall not recover more than his fair share of the oil beneath his own land by excess drainage of oil from beneath the land of his neighbor. Numerous cases, involving exceptions to Rule 37 to prevent confiscation, have come before us wherein the drilling of such wells would admittedly cause waste, but the private property rights of the interested parties have been deemed paramount and the permits sustained notwithstanding the resultant waste caused.

■ It is to be noted also that "waste" as defined by the conservation laws and the rules of the Railroad Commission is not dependent wholly upon the recovery of the maximum quantity of the oil and gas in place beneath the surface. That is, loss of, or failure to produce, recoverable oil underground, is not the sole and only factor in the determination and prevention of waste by the Railroad Commission as authorized and defined by the conservation statutes. Factors and elements to be considered as causing waste are set forth in Vernon's Annotated Civil Statutes, in Art. 6014. After enumerating some six factors applicable to underground conditions, the legislature added three other conditions applicable above ground, including market demand, as elements of waste, and provided that the Commission may consider any or all of such definitions in making rules to prevent waste. Waste, as defined by the statutes, was not confined to underground waste, but included waste above the ground as well, however caused. Art. 6029 imposes upon the Commission the duty to make and enforce rules to prevent waste, and Sec. (1) thereof directs the Commission to regulate not only "drilling and producing operations" but also "the storage, piping and distribution" of oil and gas. Sec. 5 of Art. 6049c, Vernon's Ann.Civ. Stats., *requires* the Commission to consider, as elements entering into the question of waste, and as necessary to be considered in its prevention, "the production, storage, transportation, refining, reclaiming, treating, marketing or processing of crude petroleum oil or natural gas, and the reasonable market demand therefor, * * *." And for the same purpose the legislature, Acts 1935, 44th Leg., p. 180, Ch. 76, Sec. 9, Art. 6049d, Sec. 6, Vernon's Ann.Civ.Stats., authorized the Commission to allocate and apportion allowable production among the various pools in Texas based upon market demand.

■ It is thus manifest that the bringing to the surface of the maximum amount of recoverable oil beneath a given tract or given area is but one of the elements or factors to be considered in determining the issue of physical waste. Three major methods of waste prevention have been adopted by the Commission: (1) Spacing of wells (Rule 37) to prevent excessive drilling. (2) Proration of production from wells already drilled, so as to keep total production reasonably within market demand. (3) Prevention of excess storage above ground, particularly in earthen or open air tanks. While other regulations, restrictions and inhibitions governing the production, transportation, storage, refining and sale of oil

have been made and promulgated by the Commission, the three methods above stated are the ones of major import. Of these the spacing rule is the one of longest standing, having been originally promulgated in 1919, and continuously adhered to since that date, though the distances between wells, and from property lines, have been changed as conditions, in the judgment of the Commission, required. As applied to the East Texas field these distances have for several years continuously been 330–660 feet. The 150–300-foot spacings originally prescribed for this field were increased, after a full and comprehensive hearing before the Commission, on September 2, 1931 (see Tide Water Associated Oil Co. v. Railroad Comm., Tex.Civ.App., 120 S.W.2d 544, 546), upon the finding of the Commission that the lesser spacing "threatens to cause actual physical waste due to the too rapid dissipation of gas energy in the production of oil, and also due to the too rapid encroachment of water * * *." This September 2, 1931, order states that the fact basis on which the increased distances were prescribed was to prevent "actual physical waste of oil and gas." See Stanolind Oil & Gas Co. v. Midas Oil Co., 123 S.W.2d 911, 915, writ dismissed. While the Commission has in subsequent amendments to Rule 37 made purported findings or recitations that "the closer the wells are drilled the greater will be the recovery from the area so drilled," at no time has it modified its rule or changed the spacing provisions thereof as to the field as a whole, or as to any designated portion thereof. The import of these recitals and the effect thereof on the spacings provided in the Rule were fully discussed in the Midas case, supra, to which we refer without reiteration here. Manifestly, if closer spacings than those prescribed by the Rule are necessary to prevent waste, then the findings by the Commission that the 330–660-foot spacings fixed by the Commission after full hearing were necessary to prevent "actual physical waste of oil and gas" are clearly wrong and cannot be sustained. If there be no reasonable relationship between the prevention of waste and the spacings required by the Rule, then the Rule is without factual basis to sustain it, and must fall as arbitrary. If the contention of appellant be sustained that the recitals relied upon be construed as an official finding by the Commission that the more wells drilled in the East Texas field "the greater will be the recovery from the area so drilled" constitute an official finding by

the Commission that denser drilling than allowed under the Rule is necessary to prevent waste, then the Commission is placed in the paradoxical situation of finding as a factual basis for promulgating their rule, that 330–660-foot spacing of wells is necessary to prevent waste; but that they must administer it under a fact finding that the closer wells are to each other, the less waste there will be. To state this consequence carries its own refutation. The result would be a repudiation by the Commission itself of its own rule as a conservation measure.

■ Whether the more wells more oil theory be true, in fact or not, the Commission has never made it a basis for any change in its prescribed spacings. The difficulty with such a contention is that it assumes that waste will be prevented solely by the extraction from the underground pool, the maximum amount of recoverable oil; and fails to take into account what would occur above ground if the field were densely drilled to do that. Prevention of above ground waste is as much a part of conservation program as is the prevention of underground waste; and in the former excess storage and market demand are important factors. Excess production, therefore, through dense drilling, even though it recover a greater percentage of recoverable oil from the pool, if by doing so it glut the market, cause excess storage above ground, create fire hazards, etc., thus causing waste above ground not compensated by the added recovery from beneath it, is not conserving the natural resource. Thus the Commission must weigh the one against the other, even admitting the contention of "more wells more oil" to be correct and regulate both so as to accomplish the objective of the conservation laws. In doing so the Commission has continuously adhered to the 330–660-foot spacings for wells, supplemented this by restricting, through allowables, the production from the wells already drilled, and has imposed complete shut down of all wells on designated days during the month.

■ Having predicated the spacings prescribed in Rule 37, on the fact findings by the Commission that same are necessary to prevent "physical waste of oil and gas" and having continuously adhered thereto, it is clear that testimony of witnesses that such spacings are not necessary to prevent waste, but that waste would be prevented by lesser spacings between wells, and the drilling of

the entire field to a much greater density than the Rule permits, wholly disregards the other resulting factors which would contribute to causing waste, and constitutes an attack upon the wisdom and efficacy of the Rule itself as a conservation measure. We have consistently held that such testimony is but such an attack, and does not constitute substantial evidence before the Commission justifying an exception to the Rule as necessary to prevent waste. Railroad Comm. v. Marathon Oil Co., Tex. Civ. App., 89 S.W.2d 517, writ refused; Magnolia Pet. Co. v. Railroad Comm., Tex.Civ. App., 93 S.W.2d 587, writ refused; Railroad Comm. v. Gulf Production Co., Tex. Civ.App., 115 S.W.2d 505, affirmed by Supreme Court in 134 Tex. 122, 132 S.W.2d 254; Lippincott v. Atlantic Ref. Co., Tex. Civ.App., 128 S.W.2d 847, writ dismissed.

■ The rule laid down in the Atlantic case (Gulf Land Co. v. Atlantic Ref. Co., 134 Tex. 59, 131 S.W.2d 73, 82) is whether the order attacked factually "is reasonably supported by substantial evidence." Manifestly, it is for the court to judicially determine what constitutes substantial evidence in support of the order. Mere representations before the Commission, opinions and testimony of witnesses at variance with, and in direct contradiction to, prior fact findings of the Commission itself, arrived at after extensive hearings, and which constitute a collateral, if not a direct, attack upon those findings, do not constitute "substantial evidence" which will support, by way of exception, a departure from an established Commission rule.

■ And it is not amiss to here observe that, in the writer's opinion, considerable confusion has been caused in considering Rule 37 cases, by failure to make clear a distinction between a general rule promulgated by the Commission (such Rule 37), legislative and prospective in character, applicable to an entire oil field, essential to the conservation of oil, which has the force and effect of a statute; and the application (e. g. by granting or refusing a permit as an exception) of that rule to a particular set of facts obtaining in some designated local area. The mere application of the Rule to the concrete facts of an individual case is quasi judicial and largely an administrative act in carrying out the general Rule. A permit for an exception is not, therefore, any change in the terms, necessity for, or binding effect of the general Rule. It has been frequently held that the burden is upon the applicant to show that he is entitled to an exception to the Rule. That is, that without it, his property will be confiscated; or that waste will occur. And it is clear to the writer's mind that in the face of the Commission's own findings that these spacings, as a general pattern, are necessary to prevent physical waste, before an applicant is entitled to an exception on that ground he must show that the underground conditions, where the well is sought, are different from those obtaining generally in that area. If they are not, and the Commission, as in the instant case, authorizes and permits a well within 120 feet of another producing well it must in fairness, and to prevent discrimination, give every other applicant similarly situated a like permit as a matter of right. It cannot unreasonably discriminate between tracts similarly situated. Atlantic case, supra. Such a course would, as we have often observed, nullify the Rule itself and render it nugatory. And the Commission having promulgated a general rule, applicable to all alike, and having expressly stated the factual basis for it, is itself bound by it and is without authority to violate or ignore its own rule, unless substantial ground for doing so is shown to exist. Atlantic case, supra.

Coming now to the facts of the instant case: The well in question was a second well on a .92-acre tract, being on the .67-acre subdivision thereof, which .92-acre tract was, in turn, a voluntary subdivision from a 20-acre tract (see former appeal, Richey v. Shell Pet. Corp., Tex.Civ.App., 128 S.W.2d 898); and was located approximately 120 feet from the John E. Taylor well No. 1 thereon. In the hearing before the Commission in the instant case, two witnesses testified on the issue of waste. Witness Byram for the applicant testified at length. Without detailing his testimony here, the portion relied upon by applicant to sustain the permit is fairly reflected in the following: "It is my opinion that the more wells are drilled the greater will be the recovery of oil from the field provided the rate of flow is properly restricted throughout the life of the field." He also testified that some oil under the .67-acre tract would be trapped and lost unless this well were permitted; but that the same would be true of any other similar area in the field, if not drilled to an equal density. Further, that in this, and the eight times area surrounding the 20.92 acres from which this small tract was segregated, the

512

underground conditions—that is, sand thickness, porosity, permeability, potentials, etc. —were substantially uniform; and that if the entire field were drilled to a density equal to that created by the well in question, and all permitted to produce under the existing allowables, waste would undoubtedly result.

The other witness before the Commission on the waste issue was R. W. Bourg, geologist for the Humble Oil & Refining Company, who agreed with Byram's testimony that the underground conditions and per acre content of oil in the sand under the 20.92 acres, and the eight times surrounding area were uniform, average, and approximately the same, based upon logs of wells in the area. He also testified that the well in question because of its proximity to the John E. Taylor well, and its relation to the surrounding more widely spaced wells, would cause rather than prevent waste.

Prior to the decision of the Supreme Court in the Atlantic case, in cases involving exceptions to Rule 37, this court considered both waste and confiscation, even though the permit recited only confiscation as ground for the exception, in order to determine whether the exception could be sustained on any ground. In the numerous cases brought before us involving the issue of waste, predicated upon dense drilling of a particular area, the evidence pro and con has been of substantially the same nature, and has been brought forward in so many records that this court would be justified in taking judicial notice of its general nature and import. It is not amiss to observe, as disclosed by prior adjudicated cases, that where the Commission has refused an exception on the ground that to grant it would cause waste, and their order of refusal is attacked by suit of the applicant, the Commission itself has relied upon the same character of evidence to sustain its order as is relied upon by interested parties to set aside a permit granted on that ground to show that such well will cause rather than prevent waste. The record presented in the recent case of Railroad Comm. v. Arkansas Fuel Oil Co., Tex.Civ.App., 148 S.W.2d 895, writ refused, so shows. That is, that where underground conditions, well potentials, and daily allowables are substantially uniform, the drilling of a local area or tract to a greater density than the surrounding area generally will create a low pressure area in the densely drilled portion, cause dissipation of gas energy, accelerated water encroachment, resulting coning of water around the well bore, and trapping of oil which would not occur if more uniform spacings were required. Such is the basis of the spacings prescribed in Rule 37.

■■■■ The Railroad Commission having determined and put into effect the proration rule as a necessary supplement to the spacing rule, and as based on the total number of wells already producing in this field, it is manifest that such testimony as to more wells and less allowable amounted to a collateral attack on the method adopted by the Commission to prevent waste. It was, in effect, that the Commission's method of control was wrong; and that the Commission instead should permit closer drilling than Rule 37 provides, and restrict the production, if that be necessary, to keep the top allowable within proper limits. Manifestly this was but a collateral attack on the methods adopted by the Commission, and cannot be deemed substantial evidence in support of a departure, by exception in a particular case, from the Commission's general rules. Consequently, the hearing before the Commission discloses no substantial evidence to sustain the exception. The burden was on the applicant to show that the exception was needed to prevent waste. Railroad Comm. v. Magnolia Pet. Co., 130 Tex. 484, 109 S.W.2d 967; Atlantic case, supra. The only competent evidence presented to the Commission showed the contrary.

On the trial hereof, these two witnesses testified, and in addition, the witness Hudnall. While they testified, upon cross examination, at considerable length, the witnesses Byram and Bourg both testified that the underground conditions, well potentials and allowable production were substantially uniform, and that there was no more reason for permitting the instant well only 120 feet from another producing well than in any other part of the field. That under the facts ascertained by them from logs of wells already drilled in this area, including the well involved, it would tend to create, rather than prevent, waste.

■■■■ Appellant relies, in the main, upon the testimony of the witness Hudnall. He did not testify before the Commission, but did testify at great length upon the trial hereof. His testimony was, in effect, that the Commission's spacing rule was wrong; that if the entire field were drilled to a density of three wells per acre and all al-

lowed to produce at an allowable of 20 bbls. per well per day, more oil would be ultimately recovered; that with this density (a well each 120 feet) the 400,000 wells would not produce in excess of two million barrels per day, which would not cause waste. He admitted, however, that storage and pipe line facilities in the field would not take care of more than a million barrels per day; but that the other million barrels could be removed by tank trucks of 20 to 40 barrels capacity, thus requiring 30,000 to 40,000 truck loads daily. Nor did he indicate where it would be transported and how disposed of. He did admit that under his theory of ultimate recovery of the maximum amount of oil from the pool the price of oil would probably be reduced to 5 or 10 cents per barrel. This testimony manifestly disregards above ground waste, fire hazards, excess storage, and market demand, all of which must be taken into consideration by the Commission under express direction of the conservation laws themselves. Such testimony, as we have heretofore held in cases involving the same character of testimony of the same witness, is but an attack upon the efficacy and wisdom of the Commission's own rules. It is also in direct conflict with the express fact findings of the Commission itself as a basis for increasing such spacings from 150–300 feet to 330–660 feet, hereinabove quoted. It does not therefore constitute substantial evidence as a basis for an exception to the Rule.

It is also urged by appellant that the testimony of Hudnall that the Woodbine sand, which is the highly saturated productive sand underlying the East Texas field, in this particular area was overlaid by a 40-foot strata of shale or tight sand, containing oil, which was not common to the field as a whole; that in such strata of tight sand a well would not drain more than 2 acres, and that without the well in question much of the oil in this 40-foot strata would be lost. He further testified that if this were the only justification for such well it should be drilled into, and allowed only to produce from, this upper strata; and if that were done, he would not advise the drilling of it because he did not think it would ever produce enough oil to repay the expense of drilling. It was not controverted, however, that the well in question was drilled into the Woodbine sand and was producing from that sand just as other wells in this area.

As above stated, this testimony was not presented to the Commission, but upon the trial of the case. While the statute, Sec. 8, Art. 6049c, provides that orders of the Commission "shall be deemed prima facie valid," this is but a presumption subject to rebuttal by proof. And when such order is judicially attacked on the grounds that it is not supported by the facts on which it purports to rest, the existence, vel non, of those facts is to be judicially determined upon a trial under the rules of evidence as in other cases, except that the order carries the statutory presumption in support of its validity. If there be no evidence either way, the presumption prevails. Or, as is sometimes stated, if the evidence pro and con on the issue involved be evenly balanced, the added presumption will control. 17 Tex.Jur., § 100, p. 328; Annotation, 121 A.L.R. 1078.

But in the trial of such facts the court, or jury, must, as in other cases, pass upon the credibility of the witnesses and the weight to be given their testimony. In the instant case, on the issue of waste, and as differentiating the underground conditions prevailing in the area of this particular well from those prevailing generally, and thus affording a basis for an exception to the general rule, Hudnall testified that there existed a 40-foot strata of tight oil permeated sand above the lower porous highly permeated Woodbine sand. The other two witnesses, both qualified geologists, based upon their examination of logs of wells in this area, including *that of the well in question,* both testified that no such upper 40-foot strata of saturated, permeable oil producing sand existed in this well; but that the layer or strata, of which Hudnall testified, was what was termed Austin chalk, non porous and non productive of oil. Under these circumstances, and in the light of Hudnall's other testimony, the trial court was authorized to find that no underground conditions existed in the area of this particular well which would differentiate it from the surrounding area generally and thus afford a factual basis to sustain an exception to the general rule. By holding the permit invalid, he is presumed to have so found, and his findings will not be disturbed.

We are not here concerned with the wisdom of the Commission's rules prescribed by it to conserve the natural resources. Rule 37 has repeatedly been held

to be a valid rule. After promulgating a valid rule, the Commission itself is as much bound by it as are oil producers. It cannot arbitrarily ignore it, nor arbitrarily apply it so as to cause discrimination as between oil fields or particular areas in oil fields. If facts do not exist which authorize or justify a departure or deviation by way of exception from such valid rule, such exception becomes arbitrary.

Because of the fact that this case presents an instance where a permit, once declared invalid as not sustained by the facts on which it was based, was again granted by the Commission on a different ground, we have considered, perhaps at undue length, the issue discussed. For the reasons stated, the trial court's judgment is affirmed.

Affirmed.

BLAIR, J., dissents.

#### Corrective Opinion.

BAUGH, Justice.

Our attention has been called to the statement in our original opinion that the witnesses Byram and Bourg testified before the Commissioner on the hearing of the application for the permit involved; and also that both of said witnesses testified on the trial hereof in the trial court. In this we were in error. Both of these witnesses did testify before the Commission, but the witness Byram did not testify in the trial court. The character of the testimony of such witnesses, however, whether before the Commission or before the court, was to the effect stated in our opinion. This correction is made in the interest of accuracy, and does not affect the issues presented on the appeal nor the conclusions reached in our opinion.

BLAIR, Justice (dissenting).

The majority base their decision in the instant case upon the interpretation of Rule 37 as being a finding by the Commission that waste of oil will be caused by drilling oil wells at closer distances than the minimum spacing distances prescribed in the rule. Having so interpreted the rule, the majority then hold that the evidence adduced, tending to show that the well in question would recover a substantial amount of oil that would be otherwise left in the ground and wasted, is in direct conflict with the rule itself and is but a collateral attack upon the rule. With this interpretation of the rule and conclusion I cannot agree.

Such an interpretation of the rule was made by the majority view in some of the earlier cases coming before this court. See Atlantic Oil Production Co. v. Commission, Tex.Civ.App., 85 S.W.2d 655, and cases there cited, as having made the same interpretation of the rule. It appears, however, that such an interpretation of the rule was not necessary to the decision in any case, because either the undisputed evidence showed that the permittee had the advantage under the wells already drilled, or the decision was controlled by the voluntary subdivision rule. The first case in which this majority interpretation of the rule appears to have become material was Magnolia Petroleum Co. v. Railroad Commission, Tex.Civ.App., 105 S.W.2d 787, commonly referred to as the Century case. A writ of error was granted in the Century case, and the majority view, or interpretation of the rule as theretofore expressed in all former cases and in the Century case itself, was expressly overruled, the Supreme Court interpreting the rule as being divided in two parts. The first dealing with the spacing pattern for the entire field and for wells generally; the second with specific wells, to be drilled as exceptions to the general rule to prevent waste or confiscation, and that "these two parts compose the entire rule, the one as much as the other, and must be construed together." See 130 Tex. 484, 109 S.W.2d 967, 971. Thereafter this court followed and applied this rule of the Century case in many cases and particularly in the cases of Daily v. Railroad Commission, Tex.Civ.App., 133 S.W.2d 219, writ refused, and Stanolind Oil & Gas Co. v. Midas Oil Co., Tex.Civ.App., 123 S.W.2d 911, wherein the majority appear to have reluctantly done so.

Meantime, in the case of Atlantic Ref. Co. v. Gulf Land Co., Tex.Civ.App., 122 S.W.2d 197, the majority refused to follow the Century case, the writer dissenting, and again interpreted the same Rule 37 as being an official finding by the Commission that wells drilled closer than the minimum spacing distance of 660 feet prescribed in the rule would cause waste of oil. A writ of error was promptly granted in the Gulf Land Company case and in 134 Tex. 59, 131 S.W.2d 73, 80, the Supreme Court again expressly overruled the majority view or interpretation as follows: "We

do not understand that the Commission, by the promulgation of Rule 37, has undertaken to say that it will be presumed that any well drilled at lesser distances than the minimum spacing distances named in the rule will cause waste, in the sense that in such instances oil will ultimately be lost in the ground and that would be saved if such minimum spacing distances were observed."

Furthermore, in both the Century case and the Gulf Land case, the Supreme Court interpreted Rule 37 as being promulgated for the accomplishment of orderly drilling by requiring minimum distances at which wells may be drilled without application or permit, and by requiring application and permit to drill at lesser distances to prevent waste or confiscation; and that the mere fixing of minimum distances at which wells may be drilled without application or permit was not intended as a finding by the Commission that wells drilled at closer distances than the minimum distances prescribed would cause waste as a matter of fact. The court then defined waste as that term was used in the rule as follows: " 'Waste,' as used in oil and gas Rule 37, undoubtedly means the ultimate loss of oil. If a substantial amount of oil will be saved by the drilling of a well that otherwise would ultimately be lost, the permit to drill such well may be justified under one of the exceptions provided in Rule 37 to prevent waste."

This interpretation of the rule by the Supreme Court was followed by this court in the case of Humble Oil & Ref. Co. v. Turnbow, 133 S.W.2d 191, writ refused, wherein a permit to drill a well was granted upon conflicting testimony or evidence that oil would be recovered by the drilling of the well which would not otherwise be recovered by any other well, but would be left in the ground and lost.

The Beaumont Court of Civil Appeals made the same ruling under similar facts in the case of Buckley v. Atlantic Ref. Co., 146 S.W.2d 1082, writ refused, citing the Gulf Land case as authority.

Two recent cases by the Federal Circuit Court, Gulf Land Company v. Atlantic Ref. Co., 5 Cir., 113 F.2d 902, which involved the permit to reopen and operate the same well that was denied by the majority in 122 S.W.2d 197; and Stanolind Oil & Gas Co. v. Ambrose, 5 Cir., 118 F.2d 847, follow the decision of the Supreme Court in the Gulf Land case. Other cases by the Courts of Civil Appeals follow the Gulf Land case, but the above cases are cited because the facts therein stated are practically on all fours with the facts in the instant case with respect to the issue of whether oil would be recovered by a permitted well that would not be recovered by any well then existing, but would be left in the ground and lost or wasted.

The greater part of the majority opinion is a brief or argument in support of the interpretation of Rule 37 as being a finding by the Commission that wells drilled in closer proximity than the minimum distances prescribed in the rule will cause physical waste of oil. Nothing new nor novel is presented by the argument. It is the same as has been used in all cases wherein the majority have sought to give the rule such construction. The argument in the instant case does reveal more clearly, however, that this long and continued fight between the majority view and the Commission is one relating solely to administrative policy, and over which matter the courts have no jurisdiction.

This difference as to whose administrative policy is the better is clearly shown by the argument in support of the continuous effort of the majority view to strike down the fact finding of the Commission, made in its application of Rule 37, that the more wells that are drilled in any field the more oil will be recovered, provided the total allowable for the field is restricted and wells are required to produce ratably. The majority view seeks to strike down this finding of fact upon two grounds. In the first place, it is argued that such finding is false or contradictory because the Commission has impliedly found in the rule itself that wells drilled at closer distances than the minimum distances prescribed would cause waste. This view, of course, time and time again has been overruled by the Supreme Court.

In the second place, the majority opinion points out that the original 150–300-foot spacing prescribed for wells in the East Texas field was amended on September 2, 1931, to increase the spacing distances for wells to 330–660 feet, the order of the Commission reciting that the increased spacing distances were necessary to prevent threatened physical waste of oil due to rapid dissipation of gas energy, and the rapid encroachment of water. Upon this premise the majority view proceeds to deprecate the "purported findings or recitations * * * in subsequent amendments of

Rule 37 * * * that 'the closer wells are drilled the greater will be the recovery from the area so drilled,'" contending that the Commission has not modified nor changed the 330–660-foot spacing, and in consequence the latter findings are clearly wrong and unsustainable; and that the findings that "the more wells [the] more oil" place the Commission in the paradoxical position of contending at the same time that wider spacing is needed to prevent waste, but that denser drilling will prevent waste; and that such subsequent findings constitute a repudiation by the Commission of the spacing rule itself as a conservative measure.

This argument is refuted by one statement. The 1931 amendment, which contains the recitations and findings relied upon by the majority, was made before the enactment of the proration statutes. Wells under the 150–300-foot rule were being produced at full flow, thus causing coning, channelling, and the other threatened underground waste described in the amendment. Soon after the proration statutes were put into effect the Commission found from actual experience that the principal sources of waste which the original spacing rule was intended to prevent disappeared; and, furthermore, by actual experience found that oil was being wasted under the new setup by leaving it in the ground. This is manifested by recitals in several amendments to Rule 37, made shortly after the proration statutes became effective, and particularly by its orders of August 26, 1935, February 24, 1936, and July 13, 1937, wherein the Commission recites that from its actual experience in the supervision of the East Texas field it has found that the closer wells are drilled the greater will be the ultimate recovery of oil and gas from the field, provided the total allowable is restricted and wells are required to produce ratably. Accordingly, and without change in the minimum distances at which wells may be drilled without application or permit, the Commission has developed the East Texas field under the exceptions to prevent waste or confiscation until it has been drilled to a density of one well to less than five acres instead of one well to ten acres, which would be the density if the 330–660-foot distances constituted a prescribed drilling pattern, and an implied finding that wells drilled at closer distances would cause waste. Thus the administrative interpre-

tation of the rule is conclusively established by long years of application. These interpretations of the rule by the administrative body charged with the duty of promulgating and enforcing it, repeatedly approved by the Supreme Court, have thereby become a rule of property, which cannot be destroyed by the majority view construction of this an intermediate appellate court.

The majority view takes the additional position that the Commission is mandatorily enjoined by the statute cited to take into consideration certain elements of waste defined in the statute, including particularly "market demand", in determining if a well may be drilled as an exception to prevent waste. Neither pleading nor evidence in this case raises any issue as to these statutory elements of waste. Nor is there anything in the record to show that the Commission did not take them into consideration in granting the permit to drill the well in question. The statutes themselves make prima facie valid all orders of the Commission, and, in absence of a showing to the contrary, the law presumes that these officials have complied with such statutory requirements. The Gulf Land and Century cases so hold. Thus the majority view again seeks to substitute its administrative policy for that of the administrative body on a purely administrative matter, and as to which the parties themselves have not raised any issue either before the Commission or this court. Manifestly, under this state of the record, the majority view is not authorized to set aside the order granting the permit to drill the well in question out of any consideration of conjectural market demand waste.

Another reason exists why market demand waste has no place in this case. Market demand waste relates primarily to economic waste as distinguished from physical waste of oil, although physical waste may in some indirect or remote way be caused by producing oil in excess of market demand, which upon being stored above ground may be subject to deterioration or destruction from the elements or fire. No such waste is even squinted at in the instant case. So any question of market demand waste in the case must relate solely to economic waste, which is not defined by the statute; and if any rule or regulation of the Commission defines market demand or economic waste, it is not in the record. And although no question of market de-

mand or economic waste is involved, the majority view injects the question, and strikes down the order of the Commission granting the permit to drill the well, apparently upon some sort of belief that the Commission is failing to perform its duty with respect to such matter. In any event the matter is one left to the sound discretion and judgment of the Commission. Its order granting the permit to drill the well in order that the permittee may recover a substantial amount of oil that would be otherwise left in the ground and wasted is final, and it is not within the power of the courts to disturb such administrative order. If it is the majority view that the permittee may be denied the right to drill and produce his oil and is compelled to leave it in the ground merely because its production may interfere with others in the sale of more of their oil, or for a higher price, then such view is not only unlawful, but it is wicked.

It may be observed in this connection that economic waste, under proration statutes, has been held to involve a cooperative or socialistic economic plan whereby the legislature commits to a regulatory body the duty of determining from time to time the reasonable market demand for oil and gas, limiting the total production to the amount of the market demand, and prorating such amount among the several producers. 31 Tex.Jur. 1150–1159, and cases there cited. 24 Am.Jur. 630–633, and cases there cited. When properly drawn such statutes have been held to be valid, but it does not follow that all orders entered under them are valid. This is because such regulatory power of the state is necessarily limited by the supreme law of both the state and the nation, which recognizes the rights of persons to own property and to engage in the lawful vocation of producing and selling oil and gas, and it is beyond the power of any government to seize or destroy their property without just compensation, or to arbitrarily interfere with its use and enjoyment. Pacific Palisades Ass'n v. Huntington Beach, 196 Cal. 211, 237 P. 538, 40 A.L.R. 782; Thompson v. Consolidated Gas Utilities Corp., 300 U. S. 55, 57 S.Ct. 364, 81 L.Ed. 510; Champlin Ref. Co. v. Corporation Comm., 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Bandini Pet. Co. v. Superior Court, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826; Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 99 A.L.R. 1107; Dailey v. Railroad Commission, Tex.Civ.App., 133 S.W.2d 219, writ refused. And in the Gulf Land Company and Railroad Commission v. Gulf Production Co., 134 Tex. 122, 132 S.W.2d 254, cases the Supreme Court held that a denial to an owner or lessee of a fair chance to recover the oil and gas in or under his land, or their equivalents in kind, constitutes "confiscation" within the meaning of Rule 37. Why is not this rule of law applicable in the instant case where substantial evidence showed and the Commission found that the permitted well would recover oil that would otherwise be lost by leaving it in the ground? To refuse to apply this rule of law out of any consideration of conjectural market demand or economic waste is but to trifle with justice.

In further arguing the merits of its administrative policy as opposed to that of the Commission, the majority view asserts that the Commission's "more wells more oil findings" assume that waste is prevented only by the extraction of the greatest quantity of oil from the underground pool; and that such findings fail to consider surface waste caused by excessive production, excessive storage and glutting the market. The Commission's findings assume no such facts, but are based upon the actual experience of the Commission in the development of the field. There is no evidence in the record even attempting to show that the Commission did not consider surface waste in granting the permit to drill the well, and in consequence the law presumes that it did. The position taken by the majority view is entirely assumed. Having assumed all the premises, the majority view then prescribes its own administrative formula for operation, providing that before the Commission can grant a permit to drill a well under the exception to prevent waste, it "must" weigh increased subsurface recovery secured by denser drilling against an assumed increased surface waste, and then by denying or granting the well achieve the objective of the conservation laws. The astounding statement is then made that if this formula is not adhered to there will be excessive production through dense drilling, which will "glut the market, cause excess storage above ground, create fire hazards, etc., thus causing waste above ground not compensated by the added recovery from beneath it," and that this "is not conserving the natural resource."

This "glut the market" policy is injected in the instant case for the first time in this court. There is no evidence that the production of about 20 barrels of oil per day would "glut the market." To glut the market would ordinarily result in reduction of prices. The consumers of oil might welcome some glutting of the market. Surely the legislature did not intend, when it authorized the Commission to consider "market demand" in connection with the prevention of waste of oil in the general sense of physical waste, to further authorize the Commission to establish some sort of artificial forcing of prices by governmental action, in cooperation with those engaged in the oil industry and interested in raising prices, by either stimulating demand or keeping supply within certain bounds.

However, this majority view administrative policy is sought to be substituted for that adopted by the Commission in the enforcement of its Rule 37 in the instant case. That is, the majority say that the Commission should have compared the proved loss appellant will suffer by leaving his oil in the ground, if the well is not drilled, with above ground waste, and then by striking down the permit of the Commission the majority necessarily held that the comparison was favorable to above ground waste. Just where this above ground waste will occur, or who will suffer, it is not shown by either evidence in this record or by the majority opinion. Thus unknown above ground waste is compensated at the expense of appellant by leaving his oil in the ground to be forever lost.

Has not conservation of this natural resource been effectively accomplished by the "more wells more oil findings" policy of the Commission? Leaving in the ground substantial amounts of oil which could be recovered by drilling a well is not conserving this natural resource. The Commission has found from its actual experience that the more wells drilled in any given area, the more oil will be ultimately recovered, provided allowables are restricted and wells are required to produce ratably; and that oil left in the ground by not drilling for it is lost or wasted. Accordingly, it has granted thousands of wells in the East Texas field under the exception to Rule 37 to prevent waste. It has from time to time fixed the total allowables for all wells within the market demand and prorated that amount among the pro-

ducers. It is a matter of common knowledge that by restricting allowables and shut-down periods the Commission has continuously kept production of oil within market damand. In any event, no showing is made in the instant case that production has exceeded the market demand and caused the dire waste feared by the majority; and in absence of such showing the Commission will be presumed to have done so. Obviously, the issue of market demand waste is purely a fiction in this case.

Not only does the majority view disregard all recent holdings of the Supreme Court with reference to the proper interpretation of Rule 37, but it also disregards such holdings as to the proper jurisdiction of the district court in reviewing Rule 37 orders. The majority view holds that the sufficiency of the evidence to sustain an order of the Commission granting a permit to drill an oil well as an exception to prevent waste must be determined "under the rules of evidence as in other cases" and that "the court, or jury, must as in other cases, pass upon the credibility of the witnesses and the weight to be given their testimony." This holding is in direct conflict with the holdings of the Supreme Court in the recent cases of Gulf Land Company v. Atlantic Refining Company, 134 Tex. 59, 131 S.W.2d 73, and Lone Star Gas Company v. State, 153 S.W.2d 681, 696, wherein the Supreme Court holds that Rule 37 is "an administrative matter"; and that "a court is not an administrative agency, and therefore in administrative matters it does not substitute its judgment and discretion for the judgment and discretion of a duly constituted administrative agency of the State." In this same opinion the Supreme Court reaffirms what it said in the Gulf Land Company case as follows: "The very basis of the rule announced in the Gulf Land Company case that the findings of the Commission are final on disputed matters of fact, is that the court is not an administrative body. We still adhere to the views we expressed in the Gulf Land Company case as applied to the fact findings of the Commission in instances where it acts as an administrative board or commission."

That the holdings of the majority view are directly and diametrically opposed to the quoted holdings of the Supreme Court is so clear that further discussion of the matter is unnecessary.